IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

BETSY GOREN, on behalf of the
Estate of Marjorie Goren,

       Plaintiff,

          v.

SMA HUB, INC.; HUB BUSINESS
TRUST; NV PARTNERS, LLC;
JONATHAN WALKER; and
NORTHWEST BANK,

       Defendants.

Case No. 3:24-cv-00580-JR

OPINION AND ORDER

Russo, Magistrate Judge:

       Defendant Northwest Bank ("NWB") moves for summary judgment in regard to plaintiff

Betsy Goren's claims pursuant to Fed. R. Civ. P. 56. For the reasons stated below, defendant's

motion is granted.

Page 1 – OPINION AND ORDER

## BACKGROUND[1]

This dispute emanates from the alleged misappropriation of nearly $400,000 in funds plaintiff invested, on behalf of her mother, in a secondary market annuity offered by defendants NV Partners, LLC ("NVP"), SMA Hub, Inc., Hub Business Trust ("HBT"), and Jonathan Walker (collectively the "SMA Defendants").

Since 2016, NVP has held various accounts with NWB, describing its business "as a non-bank financial company, focusing on insurance, annuities, employee benefits, and other wealth management services." McGee Decl. ¶ 2 & Exs. H-I (doc. 53); Cowell Decl. Ex. 3, at 83, 103, 116 (doc. 58); Walker Decl. ¶ 3 (doc. 62); Wright Decl. ¶ 2 (doc. 63).

"HBT was established by a Trust Agreement dated January 27, 2017, between Hub Vision as Settlor and Beneficiary, and [NVP] as Trustee." McGee Decl. ¶ 7 (doc. 53); Walker Decl. Ex. 4, at 5 (doc. 62).

On March 30, 2017, NVP executed a Promissory Note in favor of NWB in the amount of $3,000,000.00. McGee Decl. Ex. A, at 1 (doc. 53). The Promissory Note had an initial maturity date of June 21, 2017, created a revolving line of credit, and provided a "RIGHT OF SETOFF" in all accounts between the borrower/bank "[t]o the extent permitted by applicable law." *Id.* at 1-2.

As consideration, Theodore Broberg, Deborah Blair, Tyson Wright, Hub Vision LLC, Walker, NVP, and HBT separately executed Commercial Guaranties in favor of NWB warranting NVP's payment and performance under the Promissory Note. *See generally* McGee Decl. Exs. B-

---

[1] The Court generally cites to the moving party's evidence except when referring to the non-duplicative information produced by plaintiff. To the extent plaintiff and NWB attack each other's recitation of facts, this Court is not bound by either party's characterization of the evidence and instead independently reviews the record to determine whether summary judgment is appropriate. *Scott v. Harris*, 550 U.S. 372, 380 (2007). As such, only the facts borne out by the record are recounted herein.

C (doc. 53). Each Commercial Guaranty also contained a "RIGHT OF SETOFF" provision as to the named individual/entity's NWB accounts. McGee Decl. Ex. B, at 5, 19 (doc. 53); McGee Decl. Ex. C, at 1 (doc. 53).

On May 5, 2017, HBT opened a business checking account ending in 8128 with NWB. McGee Decl. ¶ 8 (doc. 53); *see also* McGee Decl. Exs. H-L (doc. 53) (NWB's Commercial Customer Profile and Commercial Customer Due Diligence forms demonstrating that HBT's account type was "checking" for business operations and set up to include both wire and remote deposit capture services). NWB "required a copy of [HBT's 2017] Trust Agreement for its loan file for purposes of confirming that HBT was a valid trust, to confirm the parties authorized to act on behalf of HBT and to confirm that HBT had the requisite ability to enter into loan documents." McGee Decl. ¶ 7 (doc. 53). NWB "similarly required organizational documents for [NVP] and HUB Vision for the same purposes." *Id.*

HBT executed and delivered a Trust Authorization to NWB, recognizing that NWB "is not acting as Trustee for the Trust" and "has assumed no obligation, other than that imposed by law, to assure that Trust assets are properly applied when paid to designated individuals or properly delivered at their direction."[2] McGee Decl. Ex. G, at 4 (doc. 53). The Trust Authorization also stated: "[NWB's] retention of Trust documents is not a representation as to the Trust's legality, nor does [NWB] assume any obligation to monitor or enforce the Trust's terms." *Id.*

---

[2] NWB "does not offer trust accounts or trust services to customers or borrowers other than IOLTA accounts for law firms." McGee Decl. ¶ 16 (doc. 53); *see also* Ayres Decl. Ex. 1, at 2 (doc. 54); Cowell Decl. Ex. 4, at 2-3 (doc. 58) (Chris McGee, NWB's Special Assets Officer, testifying that "the bank has never offered trust accounts" – "or any trust services" – "in its history," explaining that trust accounts "are distinctly separate accounts for if something is in trust, it is identified as being in trust and under trust, and it's not commingled with any other funds").

Separately, pursuant to the standard Terms and Conditions, HBT acknowledged and agreed that:

> [NWB] may (without prior notice and when permitted by law) set off the funds in this account any due and payable debt any of you owe us now or in the future. . . . If your debt arises form a promissory note, then the amount of the due and payable debt will be the full amount we have demanded as entitled under the terms of the note, and this amount may include any portion of the balance for which we have properly accelerated the due date.
>
> This right of setoff does not apply to this account if prohibited by law [and] [y]ou agree to hold us harmless from any claim arising as a result of our exercise of our right of setoff . . .
>
> Accounts may be opened by a person acting in a fiduciary capacity. A fiduciary is someone who is appointed to act on behalf of and for the benefit of another. We are not responsible for the actions of a fiduciary, including the misuse of funds. This account may be opened and maintained by a person or persons named as a trustee under a written trust agreement, or as executors, administrators, or conservators under court orders. You understand that by merely opening such an account, we are not acting in the capacity of a trustee in connection with the trust nor do we undertake any obligation to monitor enforce the terms of the trust or letters.

McGee Decl. Ex. M, at 6, 8 (doc. 53).

In accordance with the Account Access Authorization, NVP, HBT, Hub Vision LLC, and SMA Hub, Inc. were each given access to company accounts, including the HBT account (ending in 8128), the Promissory Note/Line of Credit (ending in 5069), and four additional accounts (ending in 0838, 1171, 8110, and 8119). McGee Decl. ¶ 10 & Ex. N (doc. 53).

On February 13, 2018, HBT executed an updated Account Agreement for the HBT account ending in 8128, which expressly identified it as a "business analysis checking" account. McGee Decl. Ex. O, at 2 (doc. 53).

On October 4, 2019, NWB contacted Walker to inquire about paying down the Promissory Note/Line of Credit to "eliminate the older advances on the report." Cowell Decl. Ex. 3, at 89 (doc.

58). Walker gave assurances that funds would be forthcoming into "the Trust account early Monday morning." *Id.* at 88.

On October 29, 2019, NVP and NWB executed a Change in Terms Agreement, extending the maturity date for the Promissory Note to November 21, 2019. McGee Decl. Ex. D, at 1 (doc. 53). The SMA Defendants informed NWB that "they were winding down their annuities contract business," would pay off the Promissory Note by the extended maturity date, and "agreed to no more advances on its Line of Credit." McGee Decl. ¶ 5 (doc. 53).

On November 13, 2019, the SMA Defendants' accountant requested that NWB "transfer $243,573.75 from [the HBT account] ending in 8128 to the [Promissory Note/Line of Credit account] ending in 5069." McGee Decl. Ex. Q, at 1 (doc. 53).[3] NVP was ultimately unable to pay off the Promissory Note by November 21, 2019.

On December 18, 2019, NWB contacted Walker about "a large deposit [that] came in. Can any of that be applied to the past line? I believe you said some of that could possibly be used for that." Allen Decl. Ex. 1, at 1 (doc. 38-1). Walker indicated he would call to discuss the matter. *Id.*

On January 7, 2020, NWB asked about a "$350M lump sum payment [made into the HBT account and whether the entire amount could] be used to pay down the remaining [Promissory Note/Line of Credit amount] due to the bank?" Allen Decl. Ex. 2, at 2 (doc. 38-2). In response, Walker explained: "$83,333.33 of the $350,000.00 has to be paid back to the factoring company

---

[3] This type of transaction does not appear to be unique given that "HBT made a total of 411 transfers to pay down the Line of Credit in the aggregate amount of $26,871,636.79" from the account ending in 8128 between April 17, 2017, and February 12, 2020. McGee Decl. ¶ 11 & Exs. P, R (doc. 53). "Over the same period, transfers were made from the Line of Credit to the [account ending in 8128] in the aggregate amount of $26,871.79." *Id.* "By comparison, [the] account ending in 8110 only made 33 payments on the Line of Credit over the same period of time in the aggregate amount of $349,634.35." *Id.*

[that provided additional financing and once] you account for the more than $8,000 in turn & interest costs, it will not leave much available for us to make an additional pay down." *Id.*

On January 29, 2020, NWB emailed Walker to

check in on some potential pay downs this weeks. I see $75,849 into SMA HUB. Can you pay any of that on the line? . . . Also, as a follow up to our discussion on the hemp industry . . . while there has been an acceptance at a federal level to separate the hemp industry from the marijuana industry, there is still a bit of a catch-22 for banks in that no regulatory guidance has been provided yet to help establish new bank policy and procedures, something that would be required . . . Therefore, at this time, the bank cannot accept any deposits for the hemp industry or related activity.

Cowell Decl. Ex. 3, at 113 (doc. 58). Walker responded on January 31: "The $75k we received in the Trust account this week was client funds for the purchase of an SMA. Goldstar has not received the payment due on the 28th yet. We are currently looking into the reason for the delay. Thank you for the update on the hemp industry." *Id.*

On March 2, 2020, NVP executed another Commercial Security Agreement in regard to the Promissory Note/Line of Credit account ending in 5069, granting NWB a security interest in NVP's "property of every kind and nature, whether now owned or hereafter acquired, wherever located, and whether tangible or intangible, including but not limited to" all of its accounts and contracts (specifically listing the transaction related to "Michael Dwayne Vick"[4]). *See generally* McGee Decl. Ex. F (doc. 53). The second Commercial Security Agreement again recognized

---

[4] NVP "had commenced litigation in or about 2019 against the retired professional football player" Vick relating to a failed deal: "[NVP] through [Walker] entered a transaction with Vick in which Vick received an immediate cash payment of $400,000 in September 2018 in exchange for promising to have up to three years of his future earnings rerouted from two of Vick's employers to [NVP]." First Am. Compl. ¶ 13 (doc. 48). According to plaintiff, the Vick deal was similar to the transaction she invested in, pursuant to which the SMA Defendants would "make an up-front payment to [an individual named Brian] Sand [and] in exchange . . . he would assign to the SMA Defendants and/or their affiliates Sand's rights to receive future monthly payments under certain annuities from UNUM Life." *Id.* at ¶¶ 12-13.

Page 6 – OPINION AND ORDER

NWB's "right of setoff in all of Grantor's accounts with Lender (whether checking, savings, or some other account)" to the "extent permitted by applicable law." *Id.* at 1.

Since at least that time, NWB required NVP to "provide updates on the status and progress of collection and repayment efforts for [the account ending in 5069] no less than weekly, via email or phone call, until such time as the outstanding balance on the like of credit is paid in full." Cowell Decl. Ex. 3, at 75 (doc. 58).

On April 17, 2020, plaintiff issued a check from the "GOREN FAMILY RVOC LIVING TRUST" to HBT[5] in the amount of $396,917.65 (the "Goren Check"). McGee Decl. ¶ 12 (doc. 53); Ayres Decl. Ex. 3, at 1 (doc. 54). Plaintiff signed the check: "Betsy M. Goren, trustee." Ayres Decl. Ex. 3, at 1 (doc. 54).

The Goren Check was deposited in the account ending in 8128 on April 21, 2020, and commingled with the existing funds.[6] McGee Decl. ¶ 12 & Ex. S (doc. 53). In accordance with

---

[5] Plaintiff "never" communicated directly with any SMA Defendant prior to investing, nor was she a customer of NWB. Ayres Decl. Ex. 2, at 2, 6-7 (doc. 54). Plaintiff resided in Massachusetts and her exclusive point of contact was Jill Goldman, a local individual, who solicited plaintiff's investment based in part on a publication entitled "Secondary Market Annuities: The SMA Hub Buyer's Guide." *Id.*; First Am. Compl. ¶¶ 10, 16-17, 31-32, 37, 79, 89, 94 (doc. 48); Cowell Decl. Ex. 2 (doc. 58). Plaintiff was supposed to receive payments right away, but never did; Goldman would "reassure [plaintiff] quite often that she in touch with Jonathan Walker and that the money was safe where it was" – i.e., "in a client SMA Hub Master Goldstar Trust Account" – even though the Sand/Unum deal remained pending and ultimately never transpired. Cowell Decl. Ex. 5, at 2 (doc. 58); Suppl. Ayres Decl. Ex. 12, at 10-11 (doc. 66-1). Eventually, around February 2021, plaintiff went to Goldman and "asked her for the money," at which point Goldman "did like a three-way phone call" with plaintiff and Walker, and plaintiff learned "that the money had been swept from the account at the bank." Cowell Decl. Ex. 5, at 3 (doc. 58); Suppl. Ayres Decl. Ex. 6, at 2-3 (doc. 66-1).

[6] After the Goren Check was deposited and before NWB exercised its right of setoff, $1,259,550.29 was transferred out of the account ending in 8128 over the course of 49 transactions, and $1,313,369.77 was transferred into that account from various sources. McGee Decl. ¶ 13 & Ex. R (doc. 53). And the balance fluctuated and dropped below the amount of the Goren Check on several occasions. McGee Decl. Ex. T, at 3 (doc. 53); Cowell Decl. Ex. 3, at 81 (doc. 58).

standard policy,[7] NWB was required to and did approve this transaction because the "check being deposited [was] over $10,000." Cowell Decl. Ex. 3, at 101 (doc. 58); Seelye Decl. ¶ 2 (doc. 66-3).

On May 1, 2020, NWB contacted Wright and Walker stating:

I see a significant sum coming you're your account from a Delaware credit union today so (like the Goren deposit last week) it is pretty important that you tell us about it. The reason we allowed the postponement of the weekly calls that were part of the extension agreement is that we thought you were basically shut down for COVID-19, but these deposits indicate that you're getting some business done. Can you please give me an overview of these two transactions so that we are not in the dark.

Allen Decl. Ex. 3, at 1 (doc. 38-3). Wright indicated he would stop by the bank to discuss the matter in person. *Id.*

NWB ultimately "did not receive any information that the Goren Check was being held for any purpose, or held in trust in a checking account, and understood that it would be used by the SMA Defendants for operations." Allen Decl. ¶ 5 (doc. 38); McGee Decl. ¶ 12 (doc. 53). NWB also "did not receive any information on the payor of the check, other than what was indicated on the check itself, [or] the Goren Family Revocable Trust." Allen Decl. ¶ 5 (doc. 38).

On June 24, 2020, the parties executed another Change of Terms Agreement, which extended the maturity date for the Promissory Note to August 31, 2020. McGee Decl. Ex. E, at 1 (doc. 53). The remaining principal owed at that time was $432,040.75. *Id.* As part of that agreement, NVP's monthly payments were deferred which allowed the Promissory Note to remain in good standing. *Id.*

---

[7] The "sole" purpose of NWB's "check review policy is to ensure that the Bank will not incur a loss if the check is returned NSF (non-sufficient funds) [such that when] a check is required to be approved, the Bank does not investigate the payor of the check, the purpose of the check, or how the funds will be used by a customer." Seelye Decl. ¶¶ 3-4 (doc. 66-3).

On July 8, 2020, NWB reached out to inquire when it "should expect loan payments," noting there was "over $700M in the Trust account. What are those funds related to?" Cowell Decl. Ex. 3, at 92 (doc. 58). On July 10, Walker responded with "an update on our largest pending opportunities," including the "Unum Payments from B. Sand: This deal is progressing slowly but we still have hope that it will close . . . If it has not made substantial progress by [the end of the month], we will relocate our clients' funds to a different opportunity." *Id.* at 91.

NVP neglected to pay the remaining balance on the Promissory Notice by August 31, 2020. NWB "continued discussions with the SMA Defendants in an effort to work with them to consensually pay the Line of Credit" but no progress towards a mutually agreeable resolution was made. Allen Decl. ¶ 2 (doc. 38); McGee Decl. ¶ 14 (doc. 53).

On September 23, 2020, NWB reiterated a prior request for "a brief update of the half dozen or so contracts/pending deals and your best guess for estimated completion and amount . . . the line has been matured since August 31 and we'd like to get some sort of extension to give you the runway to get the line paid off." Cowell Decl. Ex. 3, at 96 (doc. 58). Having not received a response, NWB again reached out to Walker on September 30. *Id.* at 95. Walker replied on October 2 with "an update on our largest pending opportunities," including the "Unum Payments from B. Sand: This deal is still progressing slowly and our clients want to continue holding on for it to come together (should generate about $70k-$80k in revenue for us)." *Id.* Walker and NWB continued to communicate throughout the month about completing an extension for the Line of Credit/Promissory Note. *Id.* at 93-94.

On November 30, 2020, NWB issued a notice of default to NVP in regard to the Promissory Note account ending in 5069. McGee Decl. Ex. U, at 1 (doc. 53). HBT was additionally issued a

notice of default as a guarantor on December 14, which specified that the Promissory Note must be paid in full by December 24. McGee Decl. Ex. V, at 1 (doc. 53).

The following day, NWB reached out to Walker and Wright: "Please confirm, via response to this email, that upon arrival of the wired funds, the Bank may transfer the funds to pay the loan off in full. The full payoff amount as of today is $444,176.89. Payoff amount includes principal balance of $432,040.75, interest to date of $12,076.14, and UCC termination fees of $60." Walker Decl. Ex. 3, at 1 (doc. 62). Wright responded: "Confirmed." *Id.*

On December 30, 2020, after no additional payments were made, NWB set off the sum of $447,072.17 from the HBT account ending in 8128. McGee Decl. Ex. W, at 1 (doc. 53); Cowell Decl. Ex. 3, at 98-99 (doc. 58).

On January 25, 2021, Walker sent the following email to NWB's counsel:

[NVP] would like to propose the following in order to avoid legal action and bad press from our clients who held their funds in the Hub Business Trust account at [NWB].

As we have clearly stated during our conversations with you, the funds that [NWB] deducted from the Hub Business Trust account, in an effort to pay off a line of credit that [NVP] had with them, did not belong to us. [NWB] has known this since the beginning of our relationship with them. The Hub Business Trust account has always conducted transactions in this manner and we can provide the supporting documents to show this [i]f needed . . .

What we propose is that the bank reinstate the balance on the line of credit by making it clear that the debt we owe to [NWB] is backed by a judgment that was awarded to us in this amount of $1.5MM-$2MM, which we can begin taking collection actions on as soon as March 1st, 2021, and then send our client's funds back to them directly . . .

Currently, our company has very little liquid cash available and our clients are going to take action against us. That said, we will need to explain to them, as well as the courts, and the local media, that [NWB] decided to use our client's money, that was clearly defined and understood not to be ours, from the Hub Business Trust account to settle the debt owed by us, even though they knew [it] was backed by a judgment that would clearly be sufficient to cover the debt we owed.

> Given the COVID environment we are in, and how businesses like ours are getting crushed, I am confident our clients will side with us and they will probably insist on making it a public matter. We do not want this to become a public matter, nor do we believe that [NWB] wants that. As such, we are open to anything that both parties can agree on as along as our clients get their funds back.

Cowell Decl. Ex. 3, at 72 (doc. 58).

> NWB's counsel replied:

> When we spoke on January 20, 2021, you acknowledged that your in-house attorney set up a deposit account that is subject to a right of setoff with the Bank rather than a trust account that would segregate third party funds. You additionally acknowledged that you had a claim against your former attorney. [NVP] does not have a legal or contractual right to have the line of credit reinstated or to have funds returned which were subject to a lawful right of setoff. Yet, rather than making a business proposal to the Bank, you are now threatening to defame and disparage the Bank with false claims regarding the Bank's right to setoff funds in the deposit account. The Bank will not agree to return funds in response to a threat. Further, a judgment that must be collected can never be considered collateral sufficient to ensure a loan is properly secured.

*Id.* at 71.

In April, June, and December 2021, plaintiff and her brothers sought information from Goldman surrounding when the investment funds would be returned. Suppl. Ayres Decl. Exs. 9-11 (doc. 66-1). And, via the last communication, they noted: "We are almost at year-end without the return of one dime from Jonathan [and] Mom's money was commingled with his company's money." Suppl. Ayres Decl. Ex. 11, at 2 (doc. 66-1). In each instance, Goldman professed to follow up with Walker and/or indicated that the SMA Defendants "will have the ability to make you whole in the not too far future." *See, e.g.*, Suppl. Ayres Decl. Ex. 10, at 1 (doc. 66-1).

On July 31, 2023, plaintiff filed a complaint in the Superior Court for the Commonwealth of Massachusetts, Suffolk County, against Goldman, Goldman & Associates Insurance Financial Services, Inc., KCD Financial Inc., the SMA Defendants, and NWB (the "Massachusetts Action"). Suppl. Ayres Decl. Ex. 12, at 1 (doc. 66-1). Plaintiff's claims against NWB were "for conversion

and breach of trust insofar as the Bank permitted Marjorie's trust funds to be deposited in a non-trust account." *Id.* at 2. Plaintiff's corresponding claims against the SMA Defendants hinged on the fact that "SMA Hub . . . admitt[ed] that Marjorie's $400,000 investment had in fact been commingled into an SMA Hub Account (not a client account)" and, further, "the contract between SMA Hub and Biran Sand had bever been finalized, the rights to the monthly annuity payments had never been assigned by Mr. Sand to SMA Hub and its affiliates and its affiliates never made a lump sum payment to Mr. Sand." *Id.* at 8.

On February 7, 2024, NWB was dismissed from the Massachusetts Action for lack of personal jurisdiction. Suppl. Ayres Decl. Ex. 14, at 1 (doc. 66-1).

On April 8, 2024, plaintiff initiated this action alleging claims against NWB and the SMA Defendants for conversion, unjust enrichment, negligence, and Oregon Unlawful Trade Practices Act ("UTPA") violations. Plaintiff asserted six additional claims against the SMA Defendants for breach of contract, breach of implied warranted, fraudulent inducement, promissory fraud, negligent misrepresentation, and financial elder abuse. Default was entered against the SMA Defendants on July 11, 2024.

## STANDARD

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law on an issue determines the materiality of a fact. *T.W. Elec. Servs., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of the dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *T.W. Elec.*, 809 F.2d at 630.

## DISCUSSION

NWB argues that summary judgment is warranted because plaintiff's "claims are entirely based on the deliberately false characterization of a checking account as a trust account and purported duties, which did not exist, between the Bank and a noncustomer whose check was deposited into a checking account used for operations." Def.'s Mot. Summ. J. 1 (doc. 52). According to NWB, it "acted within its legal rights by setting off funds in a guarantor's checking account against a matured loan balance." *Id.* NWB also raises specific deficiencies in regard to each of plaintiff's claims.

For the first time in its reply brief, NWB contends that plaintiff's "negligence and UTPA claims are barred by the statutes of limitations." Def.'s Reply to Mot. Summ. J. 29 (doc. 66); *but see Carstarphen v. Milsner*, 594 F.Supp.2d 1201, 1204 n.1 (D. Nev. 2009) (district courts need not address "the merits of issues first raised in a reply, as the opposing party is not afforded any opportunity to respond") (citing *United States v. Bohn*, 956 F.2d 208, 209 (9th Cir. 1992)).

Plaintiff filed a surreply surrounding defendant's evidentiary objections but did not otherwise seek leave to address NWB's new arguments. And her opposition flows almost

exclusively from the premise that her expert reports establish that the "account ending in #8128 . . . was a 'Trust Account,'" such that NWB "was prohibited from Setoff." Pl.'s Resp. to Mot. Summ. J. 3-4, 7-9 (doc. 57).

The parties' litigation tactics make elusive and impractical any comprehensive attempt to resolve the merits of this case in spite of the extensive briefing. Accordingly, the Court's analysis is limited to issues that are both dispositive and properly raised/briefed.

## I.    Preliminary Matters

The Court must resolve four evidentiary issues before reaching the substantive merits of NWB's motion: plaintiff's invocation of Fed. R. Civ. P. 56(d), the parties' respective evidentiary objections, and NWB's request to strike the testimony of plaintiff's experts – i.e. Michael Richards and Peggy Hansen – as inadmissible under Fed. R. Evid. 702.

### A.    Rule 56(d)

Plaintiff first advocates for "deferral of MSJ consideration to allow additional fact discovery and/or issuance of an order allowing further fact discovery pursuant to Fed. R. Civ. P. 56(d)." Pl.'s Resp. to Mot. Summ. J. 6 (doc. 57). In particular, plaintiff propounded Request for Production ("RFP") 7 seeking "[a]ll loan documents and account records relating to any loans or deposit accounts that were set up by or in any way involved any of the SMA Defendants." Cowell Decl. Ex. 1, at 8 (doc. 58). Plaintiff characterizes these documents as "precisely what Mr. Richards needs to complete his analysis." Pl.'s Resp. to Mot. Summ. J. 6 n.3 (doc. 57). "Yet despite the Bank's response to this seventh request stating that such documents would be produced,[8] Plaintiff has not received such documents to date." *Id.*

---

[8] NWB objected to this request "as irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, overbroad, and unduly burdensome insofar as it requests documents not related to the Litigation. Without waiving these specific objections and the general objections,

Rule 56(d) authorizes a nonmoving party's request for additional time to take discovery necessary to oppose a summary judgment motion. Fed. R. Civ. P. 56(d). The party seeking Rule 56(d) relief bears the burden of demonstrating, in affidavit or declaration: "(1) the specific facts it hopes to elicit from further discovery; (2) the facts sought exist; and (3) the sought-after facts are essential to oppose summary judgment." *Family Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.*, 525 F.3d 822, 827 (9th Cir. 2008) (citation omitted). "Failure to comply with these requirements is a proper ground for denying discovery and proceeding to summary judgment." *Id.* (citations and internal quotations omitted).

Aside from the fact that plaintiff raises the majority of these substantive arguments only in a footnote, she has not met her burden of showing that there are specific, relevant facts that further discovery would reveal, nor has she adequately explained why those facts would preclude summary judgment. Indeed, Richards affirmatively concluded, in the absence of this evidence, that "numerous Northwest Bank documents support the fact the Hub Business Trust account was identified as a trust account." Richards Decl. Ex. A, at 23 (doc. 59). He only mentions the need for "additional loan documentation" in relation to Opinion #5 – i.e., that "[s]etoff is typically one of the last resorts for collection of a loan." *Id.* at 17. In other words, as addressed in Section I(D)(i), the information sought does not appear to relate to any dispositive issue, insofar as the underlying bank documents unambiguously grant NWB the right to setoff in the event of default.

Moreover, plaintiff has never moved to compel any of the discovery she now purportedly seeks. Suppl. Ayres Decl. ¶ 4 (doc. 66-1). Instead, Richards simply listed the types of "loan

---

non-privileged responsive documents that relate to the Litigation, as defined in the Requests, will be produced." Cowell Decl. Ex. 1, at 8 (doc. 58). NWB then produced non-privileged responsive documents to RFP Number 7. *See* Suppl. Ayres Decl. ¶¶ 2, 4 (doc. 66-1) (NWB's counsel stating, under penalty of perjury, that "[t]here are no other relevant documents to produce").

documentation needed to complete the analysis of the Bank's setoff position." Pl.'s Resp. to Mot. Summ. J. 6 (doc. 57); Richards Decl. Ex. A, at 17-19 (doc. 59). But, based on the substance of plaintiff's argument – i.e., that NWB failed to meaningfully respond to RFP 7 – it is not reasonable that she never moved to compel before NWB's summary judgment motion was filed and only brings up purported discovery deficiencies in the context of her present request. *See Mackey v. Pioneer Nat'l Bank,* 867 F.2d 520, 524 (9th Cir. 1989) (a party is not entitled to additional discovery under Fed. R. Civ. P. 56(d) "if it fails diligently to pursue discovery before summary judgment"); *see also Hollway Cleaners & Laundry Co., Inc. v. Cent. Nat'l Ins. Co. of Omaha, Inc.,* 219 F.Supp.3d 996, 1003 (C.D. Cal. 2016) (denying the defendant's Rule 56(d) motion where it "never moved to compel" the sought after discovery). The Court declines to delay these proceedings in order to allow additional time for discovery.

## B.    Plaintiff's Evidentiary Objections

Via three footnotes, plaintiff objects to "all statements made by Chris McGee in Dkt. 53 made without personal knowledge and/or based on inadmissible hearsay" – including paragraphs 11 and 12 – and defendant's "reliance in the MSJ and supporting documents on deposition and other discovery responses to which Plaintiff or Plaintiff's counsel objected." Pl.'s Resp. to Mot. Summ. J. 13 n.4, 5, 8 (doc. 57).

Initially, district courts "need not consider or address substantive arguments raised only in a footnote." *Keizer Campus Ops., LLC v. Lexington Ins. Co.*, 2013 WL 4786521, *4 n.2 (D. Or. Sep. 5, 2013) (citations and internal quotations omitted). Additionally, the summary judgment record comprises hundreds of pages, and McGee's declaration spans nine of those pages. While plaintiff broadly contends evidence should be stricken, she neglects to specify, outside of one instance, those portions of the record that are inadmissible and why. As such, the Court declines

now to sort through, independently identify, and discount such statements. *See Shepard v. City of Portland*, 829 F.Supp.2d 940, 951 (D. Or. 2011) (denying an evidentiary objection under virtually identical circumstances).

Concerning plaintiff's specific objection, paragraphs 11 and 12 are based on both McGee's "personal knowledge" and corroborating documentary evidence maintained in the ordinary course of business. McGee Decl. ¶¶ 1, 11-12 (doc. 53); *see also Schiewe v. Serv. Emp'rs Int'l Union Local 503*, 2020 WL 4251801, *4 n.5 (D. Or. July 23), *adopted by* 2020 WL 5790389 (D. Or. Sept. 28, 2020) ("there are no hearsay concerns where, as here, the affiant is testifying from personal knowledge") (citation omitted); Fed. R. Evid. 803(6) (providing an exception to the hearsay rule for "records of a regularly conducted activity"). Significantly, plaintiff had the opportunity to review and respond to the underlying evidence, as it was produced during discovery and, in part, forms the basis of her expert reports. Plaintiff's objections are denied.

## C.    NWB's Evidentiary Objections

NWB argues the "Goren Declaration does not create a genuine issue of fact" because it contradicts plaintiff's prior deposition testimony and is "unsupported by any evidence in the record." Def.'s Reply to Mot. Summ. J. 9 (doc. 66). NWB also objects to the portions of Walker and Wright's declarations that are "self-serving," "largely [rely on] inadmissible hearsay," and are at odds with the documentary evidence. *Id.* at 12-15.

The Court finds that some of Walker and Wright's declaration statements merely provide background or context. Similarly, in many instances, plaintiff's declaration simply expands upon her deposition statements. For example, plaintiff's declaration clarifies that, although she initially did not have direct communication with the SMA Defendants as of April 2020 when her investment was made, she did speak with Walker and Goldman at some point in 2021 after she

demanded the return of those funds. Goren Decl. ¶ 6 (doc. 61). Other disputes in her declaration are merely semantic. *See id.* at ¶ 7 (plaintiff refuting "the Bank's position" that "there were no representations made to her about the nature of the HBT Account by the SMA Defendants themselves" – noting that she received the "Secondary Market Annuities: The SMA Hub Buyer's Guide" through Goldman).

Nevertheless, NWB's objections are well-taken in that the declarations of plaintiff, Walker, and Wright make certain broad conclusions based solely on non-specific understandings, impressions, feelings, or communications. *See F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997) ("[a] conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact"); *see also Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081-82 (9th Cir. 1996) ("mere allegation and speculation do not create a factual dispute for purposes of summary judgment").

Likewise, where these declarations unambiguously contradict prior testimony or the actual documentary evidence of record, the Court relies on the latter as detailed herein.[9] *See Kennedy v.*

---

[9] For instance, Walker declares the HBT account "was not used by SMA Defendants to pay any business expenses . . . we understood [it] to be a trust account with protection for our client funds [and] only processed transactions for the benefit of others and not for its own gain." Walker Decl. ¶¶ 4, 13 (doc. 62). Yet the uncontravened documentary record reflects that the account ending in 8128 was a business checking account that contained commingled funds, repeatedly dropped below the amount of the Goren Check, and was routinely used to pay down the Promissory Note/Line of Credit. Similarly, plaintiff disputes NWB's characterization of her deposition testimony as establishing that she did not have "a direct relationship with the Bank or ever use [its customer] services." Goren Decl. ¶ 4 (doc. 61). However, the following exchange occurred at plaintiff's deposition: "Q. And do you agree that there was no customer bank relationship between Northwest Bank and the Goren Trust? A. Correct." Ayres Decl. Ex. 2, at 3, 7 (doc. 54). In other words, plaintiff unequivocally acknowledged not having a relationship with NWB and, by extension, direct access to her investment. Earlier proceedings have explored the admitted lack of a customer-banking relationship between NWB and plaintiff. *See, e.g.*, *Goren v. SMA Hub, Inc.*, 2025 WL 1865486, *5-7 (D. Or. Apr. 28, 2025). And the fact that plaintiff's counsel objected to this question because it "calls for a legal conclusion" after plaintiff answered it is immaterial given that it was factual in nature.

*Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991) ("a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony"); *see also Brown v. Union Cty.*, 2018 WL 3371597, \*9 (D. Or. May 10), *adopted by* 2018 WL 3364663 (D. Or. July 9, 2018) (the plaintiff's subjective version of facts was insufficient to create a disputed issue of material fact where it "conflict[ed] with the plain evidence in the record and his deposition testimony"). In evaluating NWB's motion, the Court nonetheless refrains from making credibility determinations or weighing the evidence. NWB's objections are granted in part and denied in part.

### D.    Plaintiff's Expert Opinions

According to NWB, "[t]he Court should exclude the expert reports of [Richards and Hansen] because they fail to satisfy the threshold requirements for admissibility" – i.e., they are "not helpful [or] reliable." Def.'s Reply to Mot. Summ. J. 1-2, 7 (doc. 66). Essentially, NWB maintains that plaintiff's experts did not base their opinions on any meaningful evidence, insofar as the underlying banking documents are uncontradicted and speak for themselves.

Pursuant to Fed. R. Evid. 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Thus, in evaluating admissibility, the trial court must determine whether expert testimony has "a reliable basis in the knowledge and the experience of [the relevant] discipline." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993). Even if an expert is generally qualified under *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 154 (1999), the court must determine the

reasonableness of applying the expert opinion to draw conclusions about the matter to which the expert testimony is directed. *Id.* at 592-93.

"[T]he trial court is a gatekeeper, not a fact finder." *Boydstun v. U.S. Bank Nat'l Assoc.,* 187 F.Supp.3d 1213, 1216 (D. Or. 2016) (citation and internal quotation marks omitted). The test "is not the correctness of the expert's conclusions but the soundness of his methodology, and when an expert meets the threshold established by Rule 702, the expert may testify and the fact finder decides how much weight to give that testimony." *Id.* (citation and internal quotation marks omitted). "Challenges to the weight of the evidence and the expert's credibility are for a jury, not a trial judge, to evaluate." *Id.*

But "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. v. Joiner,* 522 U.S. 136, 146 (1997); *see also British Airways Board v. Boeing Co.,* 585 F.2d 946, 952 (9th Cir. 1978) (nonmoving party cannot rely on speculation or conjecture in meeting its burden of production). "Basically, the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.,* 738 F.3d 960, 969-70 (9th Cir. 2013). Ultimately, district courts enjoy considerable discretion in admitting or excluding expert testimony. *Joiner,* 522 U.S. at 146.

The Court notes that NWB does not attack Richards or Hansen's expert qualifications. Also, the fact that NWB's expert reaches different conclusions based on predominantly the same evidence does not necessarily render Richards or Hansen's methodology or reasoning invalid. Whether NWB's expert is ultimately more persuasive is not for the Court to decide. As addressed

below, NWB is still correct that the majority of Richards and Hansen's opinions are either unhelpful or pose too large an analytical leap.

### i.    Richards' Opinion/Report

Richards proffers five opinions in his report: (1) "the HUB Business Trust deposit account ending in #8128 at [NWB] was a 'Trust Account,'" (2) "[t]he HUB Business Trust account only stated that it was for 'Operating' and not receivables and payables," (3) "[NWB] was prohibited from Setoff of the HUB Business Trust account ending #8128," (4) "[NWB] did not give the [NVP], 'Trustee' and the HUB Business Trust proper notice of the 'Cure Provision' when the [Promissory Notice/Line of Credit] went into default," and (5) "[s]etoff is typically one of the last resorts for collection of a loan." Richards Decl. Ex. 1, at 6, 10, 12, 15, 17 (doc. 59).

Opinions #4 and #5 are immaterial to NWB's potential liability to plaintiff and therefore unhelpful. *See Magallon v. Robert Half Int'l, Inc.*, 743 F.Supp.3d 1237, 1243 (D. Or. 2024) ("[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful") (citation and internal quotations omitted). Further, Opinion #4 is grounded in an erroneous reading of the Cure Provision, insofar as that provision appears to be inapt given the type of payment default at issue. McGee Decl. Ex. A, at 1 (doc. 53); McGee Decl. Ex. B, at 18-20 (doc. 53).

Opinion #3 is wholly contingent upon Opinion #1, portions of the account agreements between the SMA Defendants and NWB that do not allow for setoff "if prohibited by law," and Richards' interpretation of Or. Rev. Stat. § 709.220.[10] Richards Decl. Ex. 1, at 12-15 (doc. 59). As

---

[10] This statute states, in relevant part: "Funds placed or held in trust by a trust company awaiting investment or distribution shall not be held uninvested or undistributed for a longer period than is reasonable for the proper management of the account, shall be carried in a separate account and shall not be used by the trust company, bank or extranational institution in the conduct of its business or in the conduct of the business of any of its affiliates, except that such funds may be

such, Opinion #3 (and, to a lesser extent, Opinion #2) are also unhelpful to the trier of fact if the account at issue cannot, in fact, be characterized as a trust account.

Richards mentions McGee's deposition testimony about the services offered by NWB, McGee's declaration, the email exchanges between Walker and NWB (as detailed above), the Account Agreement, the Trust Authorization, the Commercial Customer Profile, the Commercial Customer Due Diligence, and the January 2017 HBT Trust Agreement in regard to Opinion #1. *Id.* at 6-8. But his opinion ultimately hinges on the name and identity of the accountholder. *Id.*

Yet, as NWB observes, "the fact that HBT opened an account at the Bank is not representative of the nature of the account." Def.'s Reply to Mot. Summ. J. 5 (doc. 66). Indeed, Opinion #1 is irreconcilable with the factual and legal underpinnings of this case.[11] Thus, while Richards is correct that the parties labeled or periodically referred to the account ending in 8128

---

deposited in the commercial or savings or other department of the trust company, bank or extranational institution if the trust company, bank or extranational institution first obtains and sets aside in its trust department: (a) Bonds or other securities eligible for the investment of trust funds; (b) A surety bond; (c) An irrevocable letter of credit issued by an insured institution, as defined in ORS 706.008 (Additional definitions for Bank Act); or (d) A combination of the securities, letters of credit and surety bond." Or. Rev. Stat. § 709.220(1).

[11] As denoted, the parties' respective positions flow largely from their assertions surrounding the existence of a trust (or lack thereof), and the rights and remedies associated therewith. Yet neither party squarely addresses applicable trust law in their briefing, and plaintiff's position in this lawsuit is belied by the Massachusetts Action insofar as she initiated that suit precisely because the account ending in 8128 was a non-trust account that contained commingled and unassigned funds. *See Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*, 692 F.3d 983, 993 (9th Cir. 2012) (a party cannot obtain an advantage in current proceedings by taking positions that contravene those asserted in another lawsuit). In any event, while the evidence establishes that plaintiff intended the SMA Defendants to hold her funds safely/securely for investment purposes and, separately, that HBT, itself a trust entity, opened a business account with NWB, nothing supports the proposition that: (1) HBT intended NWB to be a trustee; (2) NWB owed fiduciary obligations to the SMA Defendants; or (3) the Goren deposit was appropriately treated as trust property. *See Wadsworth v. Talmage*, 365 Or. 558, 570-71, 450 P.3d 486 (2019); *Shipe et al. v. Hillman*, 206 Or. 556, 564-65, 292 P.2d 123 (1956) (surveying Oregon trust law); *see also Spada Props., Inc. v. Unified Grocers, Inc.*, 38 F.Supp.3d 1223, 1235 (D. Or. 2014) (as amended) (citing with approval the Restatement (Third) of Trusts).

as the "Hub Business Trust" – or more colloquially as the "Trust account" – and that Walker, on occasion, mentioned client funds being held at or deposited into NWB, he otherwise fails to address the express terms of the underlying banking agreements and NWB's evidence about how the HBT account was actually used. *Cf. Scott*, 550 U.S. at 380 ("[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record . . . a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment"); *Rimbert v. Eli Lilly & Co.*, 2009 WL 2208570, *14 (D. N.M. July 21, 2009), *aff'd*, 647 F.3d 1247 (10th Cir. 2011) (expert's report unreliable where a "vast body of contradictory evidence" existed and the expert "refuse[d] to engage with [that information] while offering no [new information] in return").

In sum, Opinions #1 and #3 lack an adequate foundation and veer into the range of impermissible legal conclusion.

### ii.    Hansen's Opinion/Report

Hansen's report appears to pertain to NWB's purported negligence and states:

Opinion 1. [NWB] opines that the characterization and purpose of the account identified as the "HUB BUSINESS TRUST" account number 8128 . . . was not a Trust Account . . . even though the Signature Card at NWB000811-813 makes reference three (3) times to the account name including the designation of "trust," the Trust Authorization at NWB000814-818 (a document created by the Bank and apparently required as a necessary document for account opening of a Trust, refers to the "Trust" and/or the "Trustees" no less than 41 times), each and every page of every bank statement issued on this account had the term "trust" included in the account name, documents NWB001125 and NWB001126, used by defendants in their arguments in this matter reference the account name to include "Trust," call for a Trust Agreement, and furthermore refer to the relationship as a "NonBank Financial Institution," the nature of the business as "Secondary Market Annuities" and "Investments," all which are red flags and should cause banks to pay attention and to proceed with caution.

Opinion 2: Based upon the above, I opine that to have received these documents, failed to notice the fact that they were missing most of the information requested, contained clear information that the business of the enterprise that HBT intended to conduct would involve receiving and taking control of third party's funds, arranging accounts for secondary market annuities (which always involves funds

held for others), and failed to notice that their documentation was at best woefully inadequate, that they failed to recognize obvious high risk, and certainly paid no attention to the high risk that was implied therein was at least far below industry standard and practice.

Opinion 3. NWB claims . . . that "A review of the bank statements relating to this checking account reveal a consistent pattern of the company transferring funds to other related entities' accounts, which were then used to pay operating expenses for the companies. Furthermore, there is evidence that the company routinely took advances off [NVP's] line of credit which were deposited into the HBT bank account, as well as repaying advances to the line of credit from the same account." I opine that, with 41 years working in bank operations with 28 years as an executive officer and the chief Fraud investigator for every one of my employer banks, intended perhaps to excuse the Bank's failure to notice, actually describes beautifully extremely similar processes and transaction types that almost always accompany Ponzi schemes and/or money laundering processes, should be considered red flags of potential fraud until justified, and reinforce the Bank's complete failure to recognize what was going on under their noses.

Opinion 4. I found no information in their declarations, reports or opinions that verifies the background, experience or training that should qualify McGee or Draper to opine on recognizing deposit account fraud, money laundering, Ponzi schemes, or any type of in-depth fraudulent activity, outside possibly of loans, which I would leave to others to evaluate.

Opinion 5. The Goren check that was deposited into the account mislabeled [by NWB] as the "HBT Checking Account" but was actually named the HUB Business Trust obviously was drawn on a Trust ("Goren Family RVOC Living Trust") and was payable to a Trust. Had NWB paid any attention at all, it would have known that it was a Trust, would have quickly discovered that the business disclosed was Secondary Market Annuities which would have to involve trust funds, and, should have resulted in enhanced due diligence. The next subject in this Motion states "At no time were the funds associated with the Goren Check earmarked for a special purpose nor was the Bank notified that the funds should be afforded differential treatment from any other funds in the HBT Checking Account" (again, misnaming the account and perhaps intending to mislead the reader, actual name the HUB Business Trust). It is NOT the responsibility of a third-party client of HBT to teach the Bank how to recognize red flags; it is the Bank's responsibility to recognize if this set of accounts ([NVP] and its subsidiaries) were supposed to but were not operating as business trust accounts, also known as "Professional Service Providers" and that the bank was responsible to recognize this after performing proper due diligence and identifying red flags from the onset.

Opinion 6. NWB contacted Walker about the Goren Check on May 1, 2020, fully nine (9) days after the deposit was deposited and after it had cleared. All of the excuses about information that NWB cites as not receiving were, if they mattered

by this point NOT the responsibility of anyone but NWB and its customer. And had they investigated in a timely manner about any of the red flags in this case, they would have been certain that they needed to stop the risky transactions before the Goren check was deposited.

Opinion 7. NWB pleads that between April 21, 2020, and before NWB exercised setoff on December 31, 2020, it states that $ 1,259,550.29 was transferred out of the account, over the course of 49 transactions. It speaks to much information that only it could have ever asked about and/or investigated in the eight months that elapsed. The Plaintiff in this matter obviously had nothing to do with all this; and cannot be blamed for it. But two things are quite clear here; first, that while all this was happening, NWB did nothing to find out what was going on with its borrower, and secondly, passed an entry on December 31, 2020, the last day of the year; the last day that it could do so without the issue of the "in default" loan showing on its own financials for the 2020 financial reporting, which would have brought the bad loan into sharp relief.

Opinion 8. I opine that NWB performed all throughout the subject time period in this matter in a matter negligent relative to industry standards, practice in the industry, protection against potential fraud, and in complete ignorance or avoidance of regulation compliance; to wit the USA PATRIOT Act. While PATRIOT is often combined with Bank Secrecy Act, as a 28-year BSA/AML/USAPATRIOT Officer, during the period of time in which PATRIOT was put into place and having written the procedures, the processes, and the training materials for both I opine the following:

> • The Bank Secrecy Act, enacted in 1970, primarily focuses on combating money laundering and requires financial institutions to maintain records and file reports of certain transactions, such as Currency Transaction Reports (CTRs) for cash transactions exceeding $ 10,000.00.

> • The USA PATRIOT Act, enacted in 2001, in response to the acts of September 11, 2001, aims to prevent terrorist financing and enhance national security, requiring financial institutions to conduct customer due diligence, assign risk as a result of the due diligence and monitor certain accounts based upon the degree of risk. The requirements for customer due diligence, risk rating, and enhanced monitoring were implemented as part of PATRIOT.

One of the most high-risk types of accounts that banks accept are Professional Service Providers ("PSPs"). The definition of Professional Service Providers was clarified in PATRIOT, as was the responsibility to recognize Professional Service Providers and the responsibility to "manage the risks associated with Professional Service Provider relationships," and to "implement effective due diligence, monitoring, and reporting systems." "A professional service provider acts as an intermediate between its client and the bank. These providers may conduct financial

dealings for their clients. Professional Service Providers include lawyers, accountants, investment brokers, and other third parties that act as financial liaisons for their clients." [NVP] was clearly a Professional Service Provider. As this due diligence and risk evaluation process is required by banking regulators and by banking practice, had NWB performed such due diligence as is required, there could have been no doubt that [NVP] was such an account. I add that all employees are required to have training in this area, and to know at least enough to refer red flags to those persons specifically employed to research and make determinations as to the risk. As the monitoring is required on an ongoing basis, it would have been continuing when the Goren funds were accepted by the bank. It is my opinion that had NWB performed any of the due diligence, risk assignment and monitoring of the NV accounts, they would have known, and/or should have known that the accounts were not properly utilized, and that there was extremely high risk, and most importantly, that the investors were at high risk of losing their investment as well. The Goren Trust, in my opinion was a victim of the failure to comply with those processes.

Hansen Decl. Ex. A, at 3-7 (doc. 60).

Many of these opinions are simply unhelpful to the trier of fact. Notably, neither the Bank Secrecy nor Patriot Act can form the basis of a negligence claim in this context, as the Court previously explained in regard to plaintiff's first motion to amend. *Goren*, 2025 WL 1865486 at *5; *see also* *Magallon*, 743 F.Supp.3d at 1249 (observing that "[d]istrict courts routinely exclude expert testimony that purports to apply the law to the facts of the case" before excluding expert opinions surrounding whether the defendant's "practices were FCRA compliant"). That is, a bank's "liability for failure to comply [with these statues] is to the United States government" – rather than to "some remote victim" – such that "courts are unanimous in holding that there is no private right of action under the BSA or Patriot Act [and by extension] no duty of care arising out of the BSA's monitoring requirements." *Venture Gen. Agency, LLC v. Wells Fargo Bank, N.A.*, 2019 WL 3503109, *7 (N.D. Cal. Aug. 1, 2019) (collecting cases); *Marlin v. Moody Nat'l Bank, N.A.*, 2006 WL 2382325, *7 (S.D. Tex. Aug. 16, 2006), *aff'd*, 248 Fed.Appx. 534 (5th Cir. 2007).

While Hansen speculates about what would have happened had NWB investigated the account ending in 8128 and describes the SMA Defendants' business enterprise as "high risk," she

does not identify any document or source of law (other than the Bank Secrecy/Patriot Acts) that required NWB to investigate its customers, especially for the protection of the customer's clients, beyond what is necessary to open bank accounts or obtain loans. *See* Suppl. Ayres Decl. ¶ 3 (doc. 66-1) ("[p]laintiff conducted no discovery into what due diligence the Bank conducted with respect to the HBT Checking account"); *see also* McGee Decl. Ex. G, at 4 (doc. 53); McGee Decl. Ex. M, at 6, 8 (doc. 53) (account agreements disavowing the existence of a trust or fiduciary relationship and, by extension, any obligation associated with the SMA Defendants' management of "Trust assets").

Even so, neither the Bank Secrecy Act nor Oregon law obligates a bank "to roam through its customers looking for crooks and terrorists . . . banks do not become guarantors of the integrity of the deals of their customers." *Marlin*, 2006 WL 2382325 at *7; *see also New Amsterdam Cas. Co. v. Robertson*, 129 Or. 663, 671, 278 P. 963 (1929) ("[t]he mere fact, however, that a bank knows that moneys deposited with it have by a depositor been acquired in a fiduciary capacity does not impose on it the duty, or give it the right, to institute an inquiry into the conduct of its customer in order to protect those for whom he may hold the fund, but between whom and the bank there is no privity").

Finally, Hansen's opinions fail to the extent they parallel Richards for the same reasons. NWB's motion is granted as to the aforementioned portions of Richards and Hansen's opinions.

## II.    Conversion Claim

"[U]nder Oregon common law, conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." *Chambers v. Am. Fed'n of State, Cnty., & Mun. Emps. Int'l Union, AFL-CIO*, 450 F.Supp.3d 1108, 1114 (D. Or. 2020), *aff'd*, 2021

WL 4493918 (9th Cir. May 25, 2021) (citation and internal quotations and brackets omitted). To establish "a claim for conversion under Oregon law, Plaintiffs must allege that they were entitled to immediate possession of the chattel at issue." *Id.* (citations and internal quotations omitted). "Money can qualify as a chattel for purposes of a conversion claim only when the money was wrongfully received by the party charged with conversion, or an agent is obligated to return specific money to the party claiming it." *Id.* at 1115 (citations and internal quotations omitted). "The prima facie presumption is that a fund deposited in a bank belongs to the person in whose name it has been deposited, and the burden of proof is upon another claiming such fund." *First Nat'l Bank of Portland v. Connolly*, 172 Or. 434, 453, 138 P.2d 613 (1943).

Plaintiff concedes that NWB was not an agent of the SMA Defendants. And, because the documentary evidence establishes the HBT account ending 8128 was opened and operated as a business checking account, nothing prevented NWB from exercising its right to setoff in relation to those funds. In fact, it is undisputed the SMA Defendants could not have set up a trust account at NWB. Although the record and Walker/Wright declarations demonstrate certain references to client funds and/or deals, there is no evidence indicating that the SMA Defendants instructed NWB to set aside plaintiff's deposit for a specific purpose or recipient. And the Goren Check itself was deposited in the name of HBT, endorsed by plaintiff, as trustee for her family's trust. Stated differently, it was not issued to HBT, as trustee, for plaintiff.

These facts are fatal to plaintiff's conversion claim. *Cf. United Fin. Co. v. Anderson*, 212 Or. 443, 447-48, 319 P.2d 571 (1957) ("the memorandum appearing on the checks" – which included limiting instructions – "by itself, did not restrict their use in the hands of a holder in due course" and could not support a conversion claim); *In re Birchfield*, 2022 WL 3330964, *3 (D. Or. Aug. 11, 2022) (where an oral express trust existed regarding certain funds between Melanie and

Nickerson, "Melanie breached her fiduciary duty to Nickerson by failing to keep [those] funds safe and return [them] at Nickerson's request [but by] depositing the funds in [a regular credit union] account, Melanie exposed the funds to judgment collection by [her] creditors . . . Had Melanie deposited the funds in a new, separate account in the name of "Melanie Birchfield, as trustee for Kelly Nickerson," no creditor of the Birchfields could have garnished the funds").

Similarly, plaintiff's claim fails because her funds are not sufficiently identifiable or traceable given how the SMA Defendants used the HBT account. Over eight months elapsed between the Goren Check deposit and NWB's setoff. During that time, plaintiff never alerted NWB of this dispute or that she was claiming an interest in any funds in the account ending in 8128. Also during this time, the SMA Defendants continued to use the HBT account for their operations in a manner that resulted in $1,259,550.29 being transferred out and $1,313,369.77 being transferred in. McGee Decl. ¶ 13 & Ex. R (doc. 53). And the balance dropped below the amount of the Goren Check numerous times during November and December 2020. McGee Decl. Ex. T, at 3 (doc. 53); Cowell Decl. Ex. 3, at 81 (doc. 58). In essence, nothing in the record before the Court suggests that plaintiff's funds remained in the HBT account as of December 30, 2020.

For this additional reason, summary judgment is appropriate in relation to plaintiff's conversion claim. *See Motameni v. Adams*, 2023 WL 4744736, *13 (D. Or. July 24, 2023) (granting summary judgment in favor of the plaintiff and third-party defendant in regard to the defendant's conversion claim where she failed to introduce evidence "show[ing] that the Mojo Biz funds used for the guaranteed payments came from money that was ear-marked for her") (citing *Wood Indus. Corp. v. Rose*, 271 Or. 103, 108, 530 P.2d 1945, 1248 (1975)); *cf. Shute v. Hinman*, 34 Or. 578, 580-81, 56 P. 412 (1899) (denoting "one claiming a preference over other creditors, on account of trust property, must either identify the specific property, or the proceeds thereof, or

show that the property of the debtor which he seeks to affect with such lien or preference includes

the trust property," before dismissing claims surrounding the allegedly wrongful assignment of

trust funds where "[t]he evidence shows that the money for which the plaintiff claims a preference

was indiscriminately mixed and mingled with the bank's other money, and its identity wholly

lost").

### III.    Unjust Enrichment Claim

"The elements of the quasi-contractual claim of unjust enrichment are (1) a benefit

conferred, (2) awareness by the recipient that [it] has received the benefit, and (3) it would be

unjust to allow the recipient to retain the benefit without requiring [it] to pay for it." *Burgdorf v.*

*Weston*, 259 Or.App. 755, 773, 316 P.3d 303 (2013), *rev. denied*, 355 Or. 380, 328 P.3d 696 (2014)

(citation and internal quotations omitted).

Here, because written agreements govern NWB's relationship with the SMA Defendants,

an unjust enrichment claim is unavailable to the extent premised on NWB's exercise of its

contractual rights. *See Helicopter Transp. Servs., LLC v. Sikorsky Aircraft Corp.*, 448 F.Supp.3d

1127, 1136 (D. Or. 2020) ("[a]n implied-in-law contract is implied only to prevent unjust

enrichment by one party in the absence of an express contract governing the subject matter . . . if

a dispute is governed by an express contract, then the terms of that contract control").

Relatedly, NWB was not unjustly enriched insofar as NVP defaulted on the Promissory

Note/Line of Credit and failed to pay amounts due and owing. *Cf.* Restatement (Third) of Trusts §

108(c)-(d) (a third party: (1) "who acquires an interest in trust property through a breach of trust

is entitled to retain or enforce the interest to the extent the third party is protected as a bona fide

purchaser" and (2) "need not inquire into the extent of the trustee's powers or the propriety of their

exercise, nor is the third party responsible to see that assets transferred to the trustee will be

properly applied to trust purposes. Knowledge of and compliance with the powers and duties of the trusteeship are responsibilities of the trustee, whose fiduciary obligations are enforceable by the beneficiaries").

And, as addressed in Section II, plaintiff cannot demonstrate that her funds were in the HBT account at the time NWB elected to exercise its right to setoff. *See Tupper v. Roan*, 349 Or. 211, 223, 243 P.3d 50 (2010) (among other elements, the plaintiff alleging unjust enrichment against a third-party "must establish, with strong, clear and convincing evidence, that the property in the hands of that person . . . in fact is the very property that rightfully belongs to her, or is a product of or substitute for that property") (citation and internal quotations omitted). NWB's motion is granted as to plaintiff's unjust enrichment claim.

## IV. Negligence Claim

"To prove a negligence claim under Oregon law, [the plaintiff] must show that (1) the defendants owed [her] a duty, (2) they breached that duty, and (3) the breach was the cause in fact of some legally-cognizable damage to [the plaintiff]." *Cain v. Bovis Land Lease*, 817 F.Supp.2d 1251, 1279 (D. Or. 2011) (citation omitted). "Although, following *Fazzolari,* [courts] generally analyze a defendant's liability for harm that the defendant's conduct causes another in terms of the concept of 'reasonable forseeability,' rather than the more traditional 'duty of care,' if the plaintiff invokes a special status, relationship, or standard of conduct, then that relationship may 'create,' 'define,' or 'limit' the defendant's 'duty' to the plaintiff." *Stewart v. Kids Inc. of Dallas, OR*, 245 Or.App. 267, 275, 261 P.3d 1277 (2011) (citation and internal quotations omitted).

As the Court previously explained, the bank/depositor relationship – and by extension, the bank/non-customer relationship – "does not give rise to a 'special relationship' for purposes of tort

claims under Oregon law." *Goren*, 2025 WL 1865486 at *7 (citation and internal quotations omitted).

Plaintiff has also not identified any duty that NWB allegedly breached. As discussed in Section I(D)(ii), plaintiff neglected to pinpoint any industry standard that creates a private right of action and/or imposes a standard of care on NWB in the present context. And, based on the underlying account agreements between NWB and the SMA Defendants, plaintiff cannot viably contend that NWB had a contractual obligation to safeguard the Goren Check. *Cf. InjuryLoans.com, LLC v. Buenrostro*, 529 F.Supp.3d 1178, 1185 (D. Nev. 2021) ("a bank's duty of care arises by contract and is therefore limited to its customers"). That is, NWB is not the trustee of HBT, and the sworn and unrefuted statements of NWB's employees evince they "did not receive any information that the Goren Check was being held for any purpose, or held in trust in a checking account, and understood that it would be used by the SMA Defendants for operations." Allen Decl. ¶ 5 (doc. 38); McGee Decl. ¶ 12 (doc. 53).

Lastly, plaintiff's references to Or. Rev. Stat. § 709.220 are unavailing. While the parties have not cited to, and the Court is not aware of, any case law referencing this statute, Or. Rev. Stat. Chapter 79 concerns the "Regulation of Trust Businesses." And a "trust business" means a "trust company" that has completed certain statutory requirements and the authority to act as a trustee. *See, e.g.*, Or. Rev. Stat. §§ 709.005, 709.030. Section 709.220, by its plain language, appears to govern the propriety of a trust business, including a trust company or bank, depositing trust funds in its own commercial or savings department. Both Oregon law and the Restatement (Third) of Trusts permit such deposits, provided certain safeguards are met. NWB, however, was not acting as a "trust company" in regard to plaintiff's investment – if anything, that role belonged to the SMA Defendants.

Moreover, the vague references to client funds in the documentary record prior to setoff (one of which occurred in January 2020) – especially in light of how the SMA Defendants were actually utilizing the HBT account and the fact that default had not been declared in regard to the Promissory Note/Line of Credit at the time the Goren Check was deposited – are insufficient to demonstrate that NWB's conduct was unreasonable in light of a foreseeable risk of harm that it created and that the law protects against negligent invasion. NWB's motion is granted as to plaintiff's negligence claim.

## V.    UPTA Claim

The UTPA provides a private right of action to "a person that suffers an ascertainable loss of money or property, real or personal, as a result of another person's willful use or employment of a method, act or practice declared unlawful under ORS 646.608." Or. Rev. Stat. § 646.638(1). A "willful violation occurs when the person committing the violation knew or should have known that the conduct of the person was a violation." Or. Rev. Stat. § 646.605(10). As such, "[t]o state a claim under the UTPA, a plaintiff is required to plead: (1) that the defendant violated one or more of these subsections; "(2) causation ('as a result of'); and (3) damage ('ascertainable loss')." *Bojorquez v. Wells Fargo Bank, NA*, 2013 WL 6055258, *7 (D. Or. Nov. 7, 2013) (citations and internal quotations omitted).

Plaintiff asserts violations of Or. Rev. Stat. § 646.608(1)(e), (g), and (u). Ayres Decl. Ex. 4, at 6 (doc. 54). As an initial matter, subsection (1)(u) – i.e., the catch-all provision rendering "any other unfair or deceptive conduct in trade or commerce" unlawful – is "inapplicable" where, as here, the plaintiff fails to "mention or discuss any such rule" established by the Attorney General. *Id.*; *see also* Or. Rev. Stat. § 646.608(4) ("[a]n action or suit may not be brought under subsection (1)(u) of this section unless the Attorney General has first established a rule in accordance with

the provisions of ORS chapter 183 declaring the conduct to be unfair or deceptive in trade or commerce").

Subsections (1)(e) and (g) outline the following unfair trade practices: "Represent[ing] that real estate, goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, quantities or qualities that the real estate, goods or services do not have or that a person has a sponsorship, approval, status, qualification, affiliation, or connection that the person does not have" or "are of a particular standard, quality, or grade, or that real estate or goods are of a particular style or model, if the real estate, goods or services are of another." Or. Rev. Stat. § 646.608(1)(e), (g).

Plaintiff's remaining claims are flawed in three respects. First, plaintiff admits "[n]o direct representations were made to [her] by Northwest Bank" and, further, that her "due diligence" surrounding the investment consisted of "reassur[ances] by Goldman regarding the legitimacy of investing with SMA Hub." Ayres Decl. Ex. 2, at 2-5 (doc. 54); Ayres Decl. Ex. 5, at 9-10 (doc. 54); *see also* Or. Rev. Stat. § 646.608(2) (a representation "may be any manifestation of any assertion by words or conduct, including, but not limited to, a failure to disclose a fact"). Stated differently, plaintiff fails to identify any representation, let alone a false representations, that NWB made to any party.

Second, and relatedly, plaintiff was never a customer of NWB and "did not even know what bank the [SMA Defendants were] doing business with" at the time the Goren Check was issued and deposited. Ayres Decl. Ex. 2, at 6-7 (doc. 54); Ayres Decl. Ex. 5, at 10 (doc. 54); *see also Or. Laborers-Emps. Health & Welfare Tr. Fund v. Philip Morris, Inc.*, 17 F. Supp. 2d 1170, 1180 (D. Or. 1998), *aff'd*, 185 F.3d 957 (9th Cir. 1999) (plaintiffs "lack[ed] standing to maintain

claims under the Oregon UTPA" where they "have not alleged that they are consumers of defendants' products").

Third, as a matter of law, the UTPA does not encompass investment property or business banking services. *See* Or. Rev. Stat. § 646.605(6)(a) ("'[r]eal estate, goods or services' means those that are or may be obtained primarily for personal, family or household purposes, or that are or may be obtained for any purposes as a result of a telephone solicitation, and includes loans and extensions of credit, and franchises, distributorships and other similar business opportunities, but does not include insurance"); *see also Volm v. Legacy Health Sys., Inc.*, 237 F.Supp.2d 1166, 1175 (D. Or. 2002) (agreeing with the defendant's contention "that the UTPA was intended to provide a cause of action only to consumers, not businesses"); *Stoss v. J.P. Morgan Chase Bank, N.A.*, 2014 WL 585946, *9 (D. Or. Feb. 14, 2014) (UTPA did not apply to a vacation home used as an investment/rental property); *Roach v. Mead*, 301 Or. 383, 392, 722 P.2d 1229 (1986) ("[t]he legal services plaintiff received concerned the investment of money" such that they did not fall under the UTPA). NWB's motion is granted in this regard.

## CONCLUSION

For the reasons stated herein, NWB's Motion for Summary Judgment (doc. 52) is granted. The parties' requests for oral argument are denied as unnecessary.

IT IS SO ORDERED.

DATED this 4th day of December, 2025.


_____/s/ Jolie A. Russo_____
Jolie A. Russo
United States Magistrate Judge