IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| BETSY GOREN, on behalf of the Estate of Marjorie Goren, | Case No. 3:24-cv-00580-JR |
| Plaintiff, | FINDINGS AND RECOMMENDATION |
| v. | |
| SMA HUB, INC.; HUB BUSINESS TRUST; NV PARTNERS, LLC; JONATHAN WALKER; and NORTHWEST BANK, | |
| Defendants. | |

Russo, Magistrate Judge:

Plaintiff Betsy Goren moves for entry of default judgment pursuant to Fed. R. Civ. P. 55(b)

against defendants Hub Business Trust ("HBT"), SMA Hub, Inc., and NV Partners, LLC ("NVP")

(collectively the "SMA Defendants").[1] For the reasons set forth below, plaintiff's motion should

be denied.

---

[1] Summary judgment was granted in favor of defendant Northwest Bank ("NWB") in December 2025. Defendant Jonathan Walker, who is associated with the SMA Defendants and authored a declaration in support of plaintiff's opposition to NWB's summary judgment motion, was voluntarily dismissed from this action in February 2026.

Page 1 – FINDINGS AND RECOMMENDATION

**BACKGROUND**

This dispute emanates from the alleged misappropriation of nearly $400,000 in funds plaintiff invested, on behalf of her mother, in a secondary market annuity offered by Walker and the SMA Defendants (the funds were subsequently deposited by Walker and the SMA Defendants at a NWB branch location in Lake Oswego, Oregon).

Specifically, as denoted in the Court's December 2025 Opinion and Order:

NVP has held various accounts with NWB [since 2016], describing its business "as a non-bank financial company, focusing on insurance, annuities, employee benefits, and other wealth management services" . . . On March 30, 2017, NVP executed a Promissory Note in favor of NWB in the amount of $3,000,000.00. The Promissory Note had an initial maturity date of June 21, 2017, created a revolving line of credit, and provided a "RIGHT OF SETOFF" in all accounts between the borrower/bank "[t]o the extent permitted by applicable law."

As consideration, Theodore Broberg, Deborah Blair, Tyson Wright, Hub Vision LLC, Walker, NVP, and HBT separately executed Commercial Guaranties in favor of NWB warranting NVP's payment and performance under the Promissory Note. Each Commercial Guaranty also contained a "RIGHT OF SETOFF" provision as to the named individual/entity's NWB accounts.

On May 5, 2017, HBT opened a business checking account ending in 8128 with NWB . . . pursuant to the standard Terms and Conditions, HBT acknowledged and agreed that: "[NWB] may (without prior notice and when permitted by law) set off the funds in this account any due and payable debt any of you owe us now or in the future. If your debt arises form a promissory note, then the amount of the due and payable debt will be the full amount we have demanded as entitled under the terms of the note" . . .

On February 13, 2018, HBT executed an updated Account Agreement for the HBT account ending in 8128, which expressly identified it as a "business analysis checking" account . . .

On October 29, 2019, NVP and NWB executed a Change in Terms Agreement, extending the maturity date for the Promissory Note to November 21, 2019. The SMA Defendants informed NWB that "they were winding down their annuities contract business," would pay off the Promissory Note by the extended maturity date, and "agreed to no more advances on its Line of Credit."

On November 13, 2019, the SMA Defendants' accountant requested that NWB "transfer $243,573.75 from [the HBT account] ending in 8128 to the [Promissory

Page 2 – FINDINGS AND RECOMMENDATION

Note/Line of Credit account] ending in 5069." NVP was ultimately unable to pay off the Promissory Note by November 21, 2019 . . .

On March 2, 2020, NVP executed another Commercial Security Agreement in regard to the Promissory Note/Line of Credit account ending in 5069, granting NWB a security interest in [all of NVP's accounts and contracts.] The second Commercial Security Agreement again recognized NWB's "right of setoff in all of Grantor's accounts with Lender (whether checking, savings, or some other account)" to the "extent permitted by applicable law" . . .

On April 17, 2020, plaintiff issued a check from the "GOREN FAMILY RVOC LIVING TRUST" to HBT in the amount of $396,917.65 (the "Goren Check"). Plaintiff signed the check: "Betsy M. Goren, trustee." The Goren Check was deposited in the account ending in 8128 on April 21, 2020, and commingled with the existing funds . . .

On May 1, 2020, NWB contacted Wright and Walker stating: "I see a significant sum coming you're your account from a Delaware credit union today so (like the Goren deposit last week) it is pretty important that you tell us about it. The reason we allowed the postponement of the weekly calls that were part of the extension agreement is that we thought you were basically shut down for COVID-19, but these deposits indicate that you're getting some business done. Can you please give me an overview of these two transactions so that we are not in the dark." Wright indicated he would stop by the bank to discuss the matter in person.

NWB ultimately "did not receive any information that the Goren Check was being held for any purpose, or held in trust in a checking account, and understood that it would be used by the SMA Defendants for operations." NWB also "did not receive any information on the payor of the check, other than what was indicated on the check itself, [or] the Goren Family Revocable Trust."

On June 24, 2020, the parties executed another Change of Terms Agreement, which extended the maturity date for the Promissory Note to August 31, 2020 . . . NVP neglected to pay the remaining balance on the Promissory Notice by [that date]. NWB "continued discussions with the SMA Defendants in an effort to work with them to consensually pay the Line of Credit" but no progress towards a mutually agreeable resolution was made . . .

On November 30, 2020, NWB issued a notice of default to NVP in regard to the Promissory Note account ending in 5069. HBT was additionally issued a notice of default as a guarantor on December 14, which specified that the Promissory Note must be paid in full by December 24.

The following day, NWB reached out to Walker and Wright: "Please confirm, via response to this email, that upon arrival of the wired funds, the Bank may transfer the funds to pay the loan off in full. The full payoff amount as of today is

Page 3 – FINDINGS AND RECOMMENDATION

$444,176.89. Payoff amount includes principal balance of $432,040.75, interest to date of $12,076.14, and UCC termination fees of $60." Wright responded: "Confirmed."

On December 30, 2020, after no additional payments were made, NWB set off the sum of $447,072.17 from the HBT account ending in 8128.

*Goren on Behalf of Est. of Goren v. SMA Hub, Inc.*, 2025 WL 3485722, *1-6 (D. Or. Dec. 4, 2025) (internal citations omitted); *see also Freedom Mortg. Corp. v. Madariaga*, 2025 WL 750600, *6 (E.D. Cal. Mar. 10, 2025) (court may consider the summary judgment record in resolving a motion for default judgment).

Prior to the April 2020 issuance of the Goren Check plaintiff

"never" communicated directly with any SMA Defendant [or Walker], nor was she a customer of NWB. Plaintiff resided in Massachusetts and her exclusive point of contact was Jill Goldman, a local individual, who solicited plaintiff's investment based in part on a publication entitled "Secondary Market Annuities: The SMA Hub Buyer's Guide." Plaintiff was supposed to receive payments right away, but never did; Goldman would "reassure [plaintiff] quite often that she in touch with Jonathan Walker and that the money was safe where it was" – i.e., "in a client SMA Hub Master Goldstar Trust Account" – even though the [underlying] deal remained pending and ultimately never transpired. Eventually, around February 2021, plaintiff went to Goldman and "asked her for the money," at which point Goldman "did like a three-way phone call" with plaintiff and Walker, and plaintiff learned "that the money had been swept from the account at the bank."

*Goren*, 2025 WL 3485722 at *4 n.5 (internal citations omitted).

On April 8, 2024, plaintiff initiated this action alleging claims against all defendants for conversion, unjust enrichment, negligence, and Oregon Unlawful Trade Practices Act ("UTPA") violations. Plaintiff asserted six additional claims exclusively against the SMA Defendants and Walker for breach of contract, breach of implied warranty, fraudulent inducement, promissory

Page 4 – FINDINGS AND RECOMMENDATION

fraud, negligent misrepresentation, and financial elder abuse.[2] As relief, plaintiff seeks actual/economic and noneconomic damages, and attorney fees and costs.

Plaintiff personally served the SMA Defendants between May and June 2024, and filed corresponding certificates of service with the Court. Defendants were required to answer or respond to plaintiff's Complaint by no later than July 1, 2024. In the absence of any responsive pleading, the Court granted plaintiff's motion for entry of default on July 11, 2024. On February 25, 2026, plaintiff filed the present motion for default judgment.

## STANDARD

The decision to grant or deny a motion for default judgment is within the discretion of the court. *DIRECTV, Inc. v. Hoa Huynh*, 503 F.3d 847, 852 (9th Cir. 2007). The court must consider seven factors, often referred to as the *Eitel* factors, in resolving such a motion: (1) the possibility of prejudice to the plaintiff; (2) the merits of plaintiff's substantive claim; (3) the sufficiency of the Complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy favoring decisions on the merits. *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986).

Upon the entry of default, the court accepts "the well-pleaded factual allegations in the complaint as true." *DIRECTV, Inc.*, 503 F.3d at 854. However, the court "does not accept as admitted facts that are not well-pleaded, conclusions of law, or facts relating to the amount of damages." *United States v. RiverCliff Farm, Inc.*, 2017 WL 3388172, *1 (D. Or. Aug. 7, 2017) (citations omitted). In other words, "[i]t is well settled that a default judgment for money may not

---

[2] Plaintiff thereafter twice attempted to amend her complaint to expand NWB's scope of liability. Ultimately, the Court denied plaintiff's motions explaining, in relevant part, that plaintiff's financial elder abuse claim failed as a matter of law because "it is undisputed that NWB is a qualifying financial institution that has not been convicted of physical or financial abuse." *Goren v. SMA Hub, Inc.*, 2025 WL 1865486, *7 (D. Or. Apr. 28, 2025) (collecting cases).

Page 5 – FINDINGS AND RECOMMENDATION

be entered without a hearing unless the amount claimed is a liquidated sum or capable of mathematical calculation." *Davis v. Fendler*, 650 F.2d 1154, 1161 (9th Cir. 1981).

## DISCUSSION

Plaintiff seeks economic and noneconomic damages in the amounts of $1,190,752.95 and $150,000, respectively, as well as an unspecified amount of attorney fees and costs.[3] In particular, plaintiff requests treble the "the $396,917.65 amount of the Goren Check" and emotional distress damages "estimated at $50,000" pursuant to Or. Rev. Stat. § 124.100(2), and attorney fees and costs under Or. Rev. Stat. § 124.100(2) and Or. Rev. Stat. § 646.638. Pl.'s Mot. Default J. 3-4 (doc. 78); Goren Decl. ¶ 5 (doc. 78-1). To grant default judgement, the Court must first address the appropriateness of such a judgment pursuant to the *Eitel* factors, and then assesses damages and reasonable attorney fees. *Stross v. Smith Rock Masonry Co.*, 2021 WL 2453388, *2 (D. Or. June 16, 2021).

## I.    *Eitel* Factors

The first factor "considers whether a plaintiff would suffer prejudice if default judgment is not entered, and any potential prejudice to the plaintiff favors granting a default judgment." *Contractors Bonding & Ins. Co. v. Radian Constr. Corp.*, 2021 WL 5927682, *2 (D. Or. Nov. 29), *adopted by* 2021 WL 5925962 (D. Or. Dec. 15, 2021) (citation and internal quotations omitted). Plaintiff does not address this factor in her motion or supporting affidavit.

The second and third factors concern the merits of plaintiff's claims and the sufficiency of her complaint. In the Ninth Circuit, a complaint should generally only be found insufficient if it

---

[3] Counsel "requests permission by the Court to submit a supplemental declaration to establish a sum certain for all attorney fees and costs [following the resolution of the present motion] – e.g., all fees and costs accrued up to the date of entry of the order of default against the SMA Defendants, as well as fees and costs associated with the present default judgment process." Pl.'s Mot. Default J. 4 (doc. 78).

Page 6 – FINDINGS AND RECOMMENDATION

appears certain the plaintiff is not entitled to relief under "any state of facts which could be proved in support of the claim." *Danning v. Lavine*, 572 F.2d 1386, 1388-89 (9th Cir. 1978) (citation and internal quotations omitted). While there is a liberal pleading standard in the Ninth Circuit, pleadings that do not contain necessary facts or proffer legally insufficient claims should not be established by default. *Cripps v. Life Ins. Co. of N. Am.*, 980 F.2d 1261, 1267 (9th Cir. 1992). Plaintiff does not address the second and third factors in her motion or affidavit. It is also questionable whether the dispositive complaint establishes an entitlement to relief under Oregon's financial elder abuse statute or UTPA.[4]

Initially, it is beyond dispute that plaintiff did not qualify as a "vulnerable person" within the meaning of Or. Rev. Stat. § 124.110 at the time the Goren Check was issued or deposited, or at the time NWB exercised its right to set off. Or. Rev. Stat. § 124.100(1); *see also* Goren Decl. ¶ 4 (doc. 78-1) (plaintiff "turned 65 on December 13, 2021"). While plaintiff's mother "was already in her 80s" in 2020, and plaintiff may have standing to bring suit under Or. Rev. Stat. § 124.100(3), the particular facts of this case render it far from clear whether the remaining statutory elements are met. Goren Decl. ¶ 4 (doc. 78-1); Or. Rev. Stat. § 124.100(1); *Lake v. Valais Ventures, LLC*, 2025 WL 384297, *6 (D. Or. Feb. 4, 2025) (outlining the elements of a financial elder abuse claim under Oregon law).

That is, both the pleadings and the record before the Court do not squarely address what was communicated to the SMA Defendants by Goldman surrounding plaintiff's investment and

---

[4] Beyond concluding that she is entitled to recover the value of the Goren Check, plaintiff only mentions by name two of the ten claims asserted against the SMA Defendants – namely, her financial elder abuse and UTPA claims. *Compare* First Am. Compl. ¶¶ 38-104 (doc. 48), *with* Pl.'s Mot. Default J. 4 (doc. 78). However, she does not articulate or address the elements of these claims, or provide any case law suggesting that default judgment is appropriate under the present circumstances.

Page 7 – FINDINGS AND RECOMMENDATION

the source of the funds. It is also unclear whether any of the SMA Defendants qualify as "financial institutions" under Or. Rev. Stat. § 124.115 and, by extension, Or. Rev. Stat. § 706.008. And plaintiff does not brief her fraud-based claims, and the complaint does not allege under what circumstances the SMA Defendants' marketing materials were furnished by Goldman (or whether any of the documents referenced therein were actually executed). *See, e.g.*, First Am. Compl. ¶¶ 15-18 (doc. 48).

Relatedly, there are a dearth of facts intimating the SMA Defendants acted with "an improper motive or by improper means" insofar as the record demonstrates that, as late as September 2020, the SMA Defendants retained an intention to invest plaintiff's funds in the underlying deal and, after NWB exercised its right to set-off, attempted to recoup plaintiff's funds. *Goren,* 2025 WL 3485722 at \*5-6; *see also Lake,* 2025 WL 384297 at \*6 ("[a] defendant's motives or means may be wrongful by reason of a statute or other regulation, or a recognized rule of common law, or perhaps an established standard of a trade or profession [and may] include violence, threats, intimidation, deceit, misrepresentation, bribery, unfounded litigation, defamation, and disparaging falsehood"; "to be liable for elder financial abuse based on acts committed with an improper motive, the defendant's purpose must be to inflict injury on the plaintiff [such that a] defendant acting in pursuit of its own business purposes as it saw them does not have an improper motive") (citations and internal quotations omitted).

Ambiguity surrounding plaintiff's UTPA exists for similar reasons. *See Colquitt v. Mfrs. & Traders Tr. Co.*, 144 F.Supp.3d 1219, 1231-32 (D. Or. 2015) (outlining the elements of an UTPA claim). As such, neither plaintiff's motion nor complaint establish the elements of her claims sufficient to prove liability.

Page 8 – FINDINGS AND RECOMMENDATION

The fourth factor considers the sum of money at stake. Plaintiff's motion is silent as to the fourth factor. However, the damages here are substantial; plaintiff seeks more than $1.3 million, along with attorney fees and costs. *Cf. Westphal v. Ed's Mufflers Unlimited, Inc.*, 2018 WL 4390778, *3 (D. Or. June 11), *adopted by* 2018 WL 4390718 (D. Or. Sept. 14, 2018) ("a large sum of money at stake would disfavor default damages, such as a request for $114,200 in damages") (citations and internal quotations omitted).

The fifth factor surrounds the possibility of a dispute concerning material facts. As stated above, the SMA Defendants were properly served but have not appeared in this case. "The fifth factor . . . weighs in favor of default judgment when the claims in the complaint are well-pleaded." *Joe Hand Prods. v. Holmes*, 2015 WL 5144297, *7 (D. Or. Aug. 31, 2015). Because plaintiff fails to adequately brief her claims, it cannot be determined if there exists a possibility of dispute regarding material facts.

The sixth factor considers whether the defendant's default was due to excusable neglect. The record here demonstrates that the SMA Defendants were served but have not appeared and have not otherwise indicated an intent to do so.

Finally, as to the seventh factor, while default judgements are generally disfavored and there is a strong preference for decisions made on the merits, this policy does not necessarily "weigh against default judgment because [the defendant's] failure to appear makes a decision on the merits impractical." *Contractors Bonding & Ins. Co.*, 2021 WL 5927682 at *3 (citations and internal quotations and brackets omitted). Plaintiff again neglects to discuss this factor.

## II.    Damages and Attorney Fees

As plaintiff accurately denotes, Oregon's financial elder abuse statute provides for treble damages under Or. Rev. Stat. § 124.100(2)(b). Pl.'s Mot. Default J. 4 (doc. 78). Likewise, plaintiff

Page 9 – FINDINGS AND RECOMMENDATION

is correct that both the UTPA and financial elder abuse statute authorize attorney fees and costs for prevailing parties. *Id.* (citing Or. Rev. Stat. § 124.100(2)(b) and Or. Rev. Stat. § 646.638(3)).

Yet, as addressed in Section I, plaintiff's motion and declaration are wholly silent as to the *Eitel* factors. These documents are equally deficient as to noneconomic damages. That is, the sole information surrounding noneconomic damages is plaintiff's allegation and declaration statement that she "suffered . . . severe emotional and mental pain, suffering, and distress [estimated] at $50,000" due to the SMA Defendants' actions. First Am. Compl. ¶¶ 63, 69 (doc. 48); Goren Decl. ¶ 5 (doc. 78-1).

In other words, neither the motion nor supporting evidence include any information related to circumstances surrounding the underlying events that would warrant the amount sought. *Cf. Leon v. Saldana*, 2014 WL 12709398, *2 (C.D. Cal. Dec. 15, 2014) (denying the plaintiff's amended motion for entry of default judgment where his "only proof of emotional distress is his own self-serving declaration [which] is wholly inadequate to justify an award of $150,000 in noneconomic damages," but nonetheless awarding $50,000 in non-economic damages based on the plaintiff's "allegations of lifestyle changes and stress around the time that his first child was born"); *see also Derek Andrew, Inc. v. Poof Apparel Corp.*, 528 F.3d 696, 702 (9th Cir. 2008) ("[t]he general rule of law is that upon default the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true") (citation and internal quotations omitted).

Therefore, with the exception of actual/economic damages, plaintiff has not sufficiently demonstrated that the amounts claimed are a liquidated sum or capable of mathematical calculation. In sum, the Court is unable to enter a judgment awarding damages (or, by extension, attorney fees), especially in light of the other deficiencies detailed herein.

Page 10 – FINDINGS AND RECOMMENDATION

## RECOMMENDATION

For the foregoing reasons, plaintiff's Motion for Default Judgment (doc. 78) should be denied. Any amended default judgment motion must be filed within 15 days of the District Judge's order.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order. The parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the court. Thereafter, the parties shall have fourteen (14) days within which to file a response to the objections. Failure to timely file objections to any factual determination of the Magistrate Judge will be considered as a waiver of a party's right to de novo consideration of the factual issues and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to this recommendation.

DATED this 24th day of March, 2026.


_____/s/ Jolie A. Russo_____
Jolie A. Russo
United States Magistrate Judge