IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

BETSY GOREN, on behalf of the
Estate of Marjorie Goren,

      Plaintiff,

           v.

SMA HUB, INC.; HUB BUSINESS
TRUST; NV PARTNERS, LLC;
JONATHAN WALKER; and
NORTHWEST BANK,

      Defendants.

Case No. 3:24-cv-00580-JR

FINDINGS AND
RECOMMENDATION

Russo, Magistrate Judge:

Plaintiff Betsy Goren moves for entry of default judgment pursuant to Fed. R. Civ. P. 55(b)

against defendants Hub Business Trust ("HBT"), NV Partners, LLC ("NVP"), and SMA Hub, Inc.

(collectively the "SMA Defendants").[1] For the reasons set forth below, plaintiff's amended motion

should be granted in part.

---

[1] Summary judgment was granted in favor of defendant Northwest Bank ("NWB") in December 2025. Defendant Jonathan Walker, who is associated with the SMA Defendants and authored a declaration in support of plaintiff's opposition to NWB's summary judgment motion, was voluntarily dismissed from this action in February 2026.

Page 1 – FINDINGS AND RECOMMENDATION

**BACKGROUND**

This dispute emanates from the alleged misappropriation of nearly $400,000 in funds plaintiff invested, on behalf of her mother, in a secondary market annuity offered by Walker and the SMA Defendants (the funds were subsequently deposited by Walker and the SMA Defendants at a NWB branch location in Lake Oswego, Oregon).

Specifically, as denoted in the Court's December 2025 Opinion and Order:

NVP has held various accounts with NWB [since 2016], describing its business "as a non-bank financial company, focusing on insurance, annuities, employee benefits, and other wealth management services" . . . On March 30, 2017, NVP executed a Promissory Note in favor of NWB in the amount of $3,000,000.00. The Promissory Note had an initial maturity date of June 21, 2017, created a revolving line of credit, and provided a "RIGHT OF SETOFF" in all accounts between the borrower/bank "[t]o the extent permitted by applicable law."

As consideration, Theodore Broberg, Deborah Blair, Tyson Wright, Hub Vision LLC, Walker, NVP, and HBT separately executed Commercial Guaranties in favor of NWB warranting NVP's payment and performance under the Promissory Note. Each Commercial Guaranty also contained a "RIGHT OF SETOFF" provision as to the named individual/entity's NWB accounts.

On May 5, 2017, HBT opened a business checking account ending in 8128 with NWB . . . pursuant to the standard Terms and Conditions, HBT acknowledged and agreed that: "[NWB] may (without prior notice and when permitted by law) set off the funds in this account any due and payable debt any of you owe us now or in the future. If your debt arises form a promissory note, then the amount of the due and payable debt will be the full amount we have demanded as entitled under the terms of the note" . . .

On February 13, 2018, HBT executed an updated Account Agreement for the HBT account ending in 8128, which expressly identified it as a "business analysis checking" account . . .

On October 29, 2019, NVP and NWB executed a Change in Terms Agreement, extending the maturity date for the Promissory Note to November 21, 2019. The SMA Defendants informed NWB that "they were winding down their annuities contract business," would pay off the Promissory Note by the extended maturity date, and "agreed to no more advances on its Line of Credit."

On November 13, 2019, the SMA Defendants' accountant requested that NWB "transfer $243,573.75 from [the HBT account] ending in 8128 to the [Promissory

Page 2 – FINDINGS AND RECOMMENDATION

Note/Line of Credit account] ending in 5069." NVP was ultimately unable to pay off the Promissory Note by November 21, 2019 . . .

On March 2, 2020, NVP executed another Commercial Security Agreement in regard to the Promissory Note/Line of Credit account ending in 5069, granting NWB a security interest in [all of NVP's accounts and contracts.] The second Commercial Security Agreement again recognized NWB's "right of setoff in all of Grantor's accounts with Lender (whether checking, savings, or some other account)" to the "extent permitted by applicable law" . . .

On April 17, 2020, plaintiff issued a check from the "GOREN FAMILY RVOC LIVING TRUST" to HBT in the amount of $396,917.65 (the "Goren Check"). Plaintiff signed the check: "Betsy M. Goren, trustee." The Goren Check was deposited in the account ending in 8128 on April 21, 2020, and commingled with the existing funds . . .

On May 1, 2020, NWB contacted Wright and Walker stating: "I see a significant sum coming you're your account from a Delaware credit union today so (like the Goren deposit last week) it is pretty important that you tell us about it. The reason we allowed the postponement of the weekly calls that were part of the extension agreement is that we thought you were basically shut down for COVID-19, but these deposits indicate that you're getting some business done. Can you please give me an overview of these two transactions so that we are not in the dark." Wright indicated he would stop by the bank to discuss the matter in person.

NWB ultimately "did not receive any information that the Goren Check was being held for any purpose, or held in trust in a checking account, and understood that it would be used by the SMA Defendants for operations." NWB also "did not receive any information on the payor of the check, other than what was indicated on the check itself, [or] the Goren Family Revocable Trust."

On June 24, 2020, the parties executed another Change of Terms Agreement, which extended the maturity date for the Promissory Note to August 31, 2020 . . . NVP neglected to pay the remaining balance on the Promissory Notice by [that date]. NWB "continued discussions with the SMA Defendants in an effort to work with them to consensually pay the Line of Credit" but no progress towards a mutually agreeable resolution was made . . .

On November 30, 2020, NWB issued a notice of default to NVP in regard to the Promissory Note account ending in 5069. HBT was additionally issued a notice of default as a guarantor on December 14, which specified that the Promissory Note must be paid in full by December 24.

The following day, NWB reached out to Walker and Wright: "Please confirm, via response to this email, that upon arrival of the wired funds, the Bank may transfer the funds to pay the loan off in full. The full payoff amount as of today is

Page 3 – FINDINGS AND RECOMMENDATION

$444,176.89. Payoff amount includes principal balance of $432,040.75, interest to date of $12,076.14, and UCC termination fees of $60." Wright responded: "Confirmed."

On December 30, 2020, after no additional payments were made, NWB set off the sum of $447,072.17 from the HBT account ending in 8128.

*Goren on Behalf of Est. of Goren v. SMA Hub, Inc. ("Goren I")*, 2025 WL 3485722, *1-6 (D. Or. Dec. 4, 2025)* (internal citations omitted); *see also Freedom Mortg. Corp. v. Madariaga*, 2025 WL 750600, *6 (E.D. Cal. Mar. 10, 2025)* (court may consider the summary judgment record in resolving a motion for default judgment).

Prior to the April 2020 issuance of the Goren Check plaintiff

"never" communicated directly with any SMA Defendant [or Walker], nor was she a customer of NWB. Plaintiff resided in Massachusetts and her exclusive point of contact was Jill Goldman, a local individual, who solicited plaintiff's investment based in part on a publication entitled "Secondary Market Annuities: The SMA Hub Buyer's Guide." Plaintiff was supposed to receive payments right away but never did; Goldman would "reassure [plaintiff] quite often that she in touch with Jonathan Walker and that the money was safe where it was" – i.e., "in a client SMA Hub Master Goldstar Trust Account" – even though the [underlying] deal remained pending and ultimately never transpired. Eventually, around February 2021, plaintiff went to Goldman and "asked her for the money," at which point Goldman "did like a three-way phone call" with plaintiff and Walker, and plaintiff learned "that the money had been swept from the account at the bank."

*Goren I*, 2025 WL 3485722 at *4 n.5 (internal citations omitted).

On April 8, 2024, plaintiff initiated this action alleging claims against all defendants for conversion, unjust enrichment, negligence, and Oregon Unlawful Trade Practices Act ("UTPA") violations. Plaintiff asserted six additional claims against the SMA Defendants and Walker for breach of contract, breach of implied warranty, fraudulent inducement, promissory fraud, negligent misrepresentation, and financial elder abuse.

Plaintiff personally served the SMA Defendants between May and June 2024 and filed corresponding certificates of service with the Court. Defendants were required to answer or

Page 4 – FINDINGS AND RECOMMENDATION

respond to plaintiff's Complaint by no later than July 1, 2024. In the absence of any responsive pleading from the SMA Defendants, the Court granted plaintiff's motion for entry of default on July 11, 2024.

On February 25, 2026, plaintiff filed her initial motion for default judgment, seeking economic and noneconomic damages in the amounts of $1,190,752.95 and $150,000, respectively, as well as an unspecified amount of attorney fees and costs. In particular, plaintiff requested treble damages in the amount of the Goren Check ($396,917.65) and treble her emotional distress damages "estimated at $50,000" pursuant to Or. Rev. Stat. § 124.100(2). Pl.'s Mot. Default J. 3-4 (doc. 78). The Court denied that motion on the grounds that "plaintiff's motion and declaration [were] wholly silent as to the *Eitel* factors." *Goren on Behalf of Est. of Marjorie Goren v. Sma Hub, Inc. ("Goren II")*, 2026 WL 1096113, *4-6 (D. Or. Mar. 24), *adopted by* 2026 WL 1093987 (D. Or. Apr. 22, 2026). The Court also detailed several other pleading/briefing deficiencies, especially in regard to plaintiff's UTPA and financial elder abuse claims, which formed the basis of her request for attorney fees and treble damages. On May 7, 2026, plaintiff lodged an amended motion for entry of default judgment.

### STANDARD

The decision to grant or deny a motion for default judgment is within the discretion of the court. *DIRECTV, Inc. v. Hoa Huynh*, 503 F.3d 847, 852 (9th Cir. 2007). The court must consider seven factors, often referred to as the *Eitel* factors, in resolving such a motion: (1) the possibility of prejudice to the plaintiff; (2) the merits of plaintiff's substantive claim; (3) the sufficiency of the Complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy favoring decisions on the merits. *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986).

Page 5 – FINDINGS AND RECOMMENDATION

Upon the entry of default, the court accepts "the well-pleaded factual allegations in the complaint as true." *DIRECTV, Inc.*, 503 F.3d at 854. However, the court "does not accept as admitted facts that are not well-pleaded, conclusions of law, or facts relating to the amount of damages." *United States v. RiverCliff Farm, Inc.*, 2017 WL 3388172, *1 (D. Or. Aug. 7, 2017) (citations omitted). "It is well settled that a default judgment for money may not be entered without a hearing unless the amount claimed is a liquidated sum or capable of mathematical calculation." *Davis v. Fendler*, 650 F.2d 1154, 1161 (9th Cir. 1981).

## DISCUSSION

Via her amended motion, plaintiff again seeks treble the amount of the Goren Check and treble her emotional distress damages pursuant to Or. Rev. Stat. § 124.100(2). Pl.'s Am. Mot. Default 21 (doc. 82). She also requests attorney fees and costs under Or. Rev. Stat. § 124.100(2) and Or. Rev. Stat. § 646.638. *Id.* In other words, plaintiff requests precisely the same amount of damages – $1,340,752.95 – plus an unspecified amount of attorney fees and costs to be determined at a later date. To grant default judgement, the Court must first address the appropriateness of such a judgment pursuant to the *Eitel* factors, and then assesses damages and reasonable attorney fees. *Stross v. Smith Rock Masonry Co.*, 2021 WL 2453388, *2 (D. Or. June 16, 2021).

## I.    *Eitel* Factors

The Court accepts plaintiff's well-plead factual assertions as true (to the extent they do not conflict with the summary judgment record) because default has been entered against the SMA Defendants. And the Court concludes that the *Eitel* factors, on balance, support granting plaintiff's motion in part.

The first factor "considers whether a plaintiff would suffer prejudice if default judgment is not entered, and any potential prejudice to the plaintiff favors granting a default judgment."

*Contractors Bonding & Ins. Co. v. Radian Constr. Corp.*, 2021 WL 5927682, *2 (D. Or. Nov. 29), *adopted by* 2021 WL 5925962 (D. Or. Dec. 15, 2021) (citation and internal quotations omitted). Because she has no other means to disgorge the SMA Defendants of the benefit of the underlying investment funds, the first factor favors granting plaintiff's amended motion.

The second and third factors concern the merits of plaintiff's claims and the sufficiency of her complaint. In the Ninth Circuit, a complaint should generally only be found insufficient if it appears certain the plaintiff is not entitled to relief under "any state of facts which could be proved in support of the claim." *Danning v. Lavine*, 572 F.2d 1386, 1388-89 (9th Cir. 1978) (citation and internal quotations omitted). While there is a liberal standard in the Ninth Circuit, pleadings that do not contain necessary facts or proffer legally insufficient claims cannot be established by default. *Cripps v. Life Ins. Co. of N. Am.*, 980 F.2d 1261, 1267 (9th Cir. 1992).

Plaintiff asserts ten claims against the SMA Defendants; all plead in the alternate and aimed at recovering the value of the Goren Check. *See, e.g.*, First Am. Compl. ("FAC") pgs. 30-31 (doc. 48). The Court finds that plaintiff has sufficiently plead unjust enrichment. That is, the FAC includes well-plead facts indicating plaintiff conferred a benefit on the SMA Defendants in the form of the $396,917.65 deposit, and the SMA Defendants were aware that they had received that benefit and it would be unjust to allow them to retain it. *Id.* at ¶¶ 9-37, 42-45; *see also Burgdorf v. Weston*, 259 Or.App. 755, 773, 316 P.3d 303 (2013), *rev. denied*, 355 Or. 380, 328 P.3d 696 (2014) (outlining the elements of the quasi-contractual claim of unjust enrichment under Oregon law). As referenced at other points in this litigation, there is also no indication that plaintiff and the SMA Defendants executed any documents or agreements related to the Goren Check. *Cf. Helicopter Transp. Servs., LLC v. Sikorsky Aircraft Corp.*, 448 F.Supp.3d 1127, 1136 (D. Or. 2020) ("[a]n implied-in-law contract is implied only to prevent unjust enrichment by one party in the absence

Page 7 – FINDINGS AND RECOMMENDATION

of an express contract governing the subject matter . . . if a dispute is governed by an express contract, then the terms of that contract control").

Although it presents a closer question, the FAC may also plausibly allege a claim for conversion. But, as discussed at summary judgment, neither the FAC nor the record include facts reflecting "the money was wrongfully received by the party charged with conversion" or that her funds were "sufficiently identifiable or traceable given how the SMA Defendants used the HBT account." *Goren I*, 2025 WL 3485722 at *16. Indeed, the FAC acknowledges plaintiff voluntarily invested the underlying funds with the SMA Defendants and the summary judgment record evinces plaintiff did not request those funds back until February 2021, well after NWB's set off. *Id.* at *4 n.5; FAC ¶¶ 9-12, 18-20 (doc. 48).

Plaintiff's remaining theories, however, remain deficient. Concerning her negligence-based theories, as this Court has repeatedly stated, the bank/depositor or analogous relationships do not "give rise to a 'special relationship' for purposes of tort claims under Oregon law." *Goren I*, 2025 WL 3485722 at *17 (citation and internal quotations omitted). NVP and the SMA Hub, Inc. hold themselves out as financial companies that, among other things, offer wealth management services. *Id.* at *1; FAC ¶¶ 2, 4, 37(b) (doc. 48). And HBT was the trust established to facilitate some of those transactions. *See generally Goren I*, 2025 WL 3485722; FAC ¶ 3 (doc. 48). Despite having myriad opportunities to do so, plaintiff has not cited to, and the Court is not aware of, any authority extending a special relationship to anything approaching the present circumstances, and some of the allegations on which she relies in her amended motion are at odds with the summary judgment record. *Compare* Pl.'s Am. Mot. Default 14-15, 18-19 (doc. 82), *with Goren I*, 2025 WL 3485722 at *1-15, 18.

Regarding allegations sounding in fraud, as the Court previously expounded:

> they must be accompanied by the who, what, when, where, and how of the misconduct charged. In addition, Rule 9(b) does not allow a complaint to merely lump multiple defendants together but requires plaintiffs to differentiate their allegations when suing more than one defendant and inform each defendant separately of the allegations surrounding his alleged participation in the fraud.

*Goren v. SMA Hub, Inc. ("Goren III")*, 2025 WL 1865486, *6 (D. Or. Apr. 28, 2025) (internal citations and quotations omitted). Here, plaintiff's fraud-based claims are premised on two of Goldman's actions: (1) her solicitation of plaintiff's investment based in part on the "Secondary Market Annuities: The SMA Hub Buyer's Guide," and (2) her statements that plaintiff "would earn a 'guaranteed' rate of 4% on this product and that Marjorie would be paid back approximately $4,000 a month over the next ten years pursuant to a 'payout schedule' which Goldman provided." FAC ¶¶ 10-12, 16-17 (doc. 48); *Goren I*, 2025 WL 3485722 at *4 n.5.

Thus, as the Court remarked in denying her initial motion, plaintiff's fraud-based claims are dubious since "both the pleadings and the record before the Court do not squarely address what was communicated to the SMA Defendants by Goldman surrounding plaintiff's investment and the source of the funds . . . and the complaint does not allege under what circumstances the SMA Defendants' marketing materials were furnished by Goldman (or whether any of the documents referenced therein were actually executed)." *Goren II*, 2026 WL 1096113 at *4. Stated differently, plaintiff does not: differentiate between NVP, HBT, and the SMA Hub, Inc. for the purposes of her motion; adequately address the who, what, when, where, and how of any SMA Defendants' allegedly wrongful actions; or delineate how the statements or actions of a third-party can be appropriately attributed to a named defendant or group of defendants. FAC ¶¶ 78-95 (doc. 48); Pl.'s Am. Mot. Default 17-18 (doc. 82).

Page 9 – FINDINGS AND RECOMMENDATION

Plaintiff's contract-based claims fail because, as noted above, she does not identify any oral or written agreement between herself and the SMA Defendants, let alone its relevant terms. *See Jackson v. Gill*, 2021 WL 5239509, at *4 (D. Or. Oct. 15), *adopted by* 2021 WL 5237232 (D. Or. Nov. 10, 2021) (no viable breach of contract claim where, "even assuming a contract existed, [p]laintiff does not allege any facts about the terms of the contract or facts showing his substantial performance of the contract's terms"). In fact, both plaintiff's amended motion and the FAC make clear that her contract claims are premised on Goldman's presentation of information surrounding the investment, as opposed to any direct "meeting of the minds" between plaintiff and the SMA Defendants. FAC ¶¶ 35, 37(b), 71-77 (doc. 48); Pl.'s Am. Mot. Default 16-17 (doc. 82); *Goren I,* 2025 WL 3485722 at *4 n.5; *see also Dickson v. Travelers Cas. Ins. Co. of Am.*, 2024 WL 3595618, *3 (D. Nev. July 31, 2024) ("[i]t is black letter law, then, that a defendant must be a party to the contract at issue for a breach of contract claim to survive").

Moreover, as the Court explained in regard to plaintiff's initial motion, presuming she has "standing to bring suit under Or. Rev. Stat. § 124.100(3), the particular facts of this case render it far from clear whether the remaining statutory elements [a financial elder abuse claim] are met." *Goren I*, 2025 WL 3485722 at *4 (citations omitted). Significantly, plaintiff's amended motion wholly neglects to address the Court's concerns surrounding "whether any of the SMA Defendants qualify as 'financial institutions' under Or. Rev. Stat. § 124.115 and, by extension, Or. Rev. Stat. § 706.008." *Id.*; Pl.'s Am. Mot. Default 19-20 (doc. 82); *see also Goren III*, 2025 WL 1865486 at *7 (explaining that qualifying financial institutions "are statutorily exempt from a claim for financial abuse of a vulnerable person") (citations and internal quotations and brackets omitted). This is especially problematic given that the FAC expressly alleges the "SMA Defendants . . . operate [as]

Page 10 – FINDINGS AND RECOMMENDATION

Non-Bank Financial Institution[s], purchasing and marketing secondary market annuities." FAC ¶¶ 2-4, 37(b) (doc. 48).

Additionally, there remain a "dearth of facts intimating the SMA Defendants acted with 'an improper motive or by improper means' insofar as the record demonstrates that, as late as September 2020, the SMA Defendants retained an intention to invest plaintiff's funds in the Unum/Sand deal and, after NWB exercised its right to set off, attempted to recoup plaintiff's funds."[2] *Goren I*, 2025 WL 3485722 at *5; *see also see also* *Lake v. Valais Ventures, LLC*, 2025 WL 384297, *6 (D. Or. Feb. 4, 2025) (outlining the elements of a financial elder abuse claim under Oregon law and denoting a "defendant's motives or means may be wrongful [so as to satisfy the fourth requirement] by reason of a statute or other regulation, or a recognized rule of common law, or perhaps an established standard of a trade or profession [and may] include violence, threats, intimidation, deceit, misrepresentation, bribery, unfounded litigation, defamation, and disparaging falsehood"; "to be liable . . . the defendant's purpose must be to inflict injury on the plaintiff [such that a] defendant acting in pursuit of its own business purposes as it saw them does not have an improper motive") (citations and internal quotations omitted).

As the Court observed, plaintiff's UTPA claim was deficient "for similar reasons." *Goren I*, 2025 WL 3485722 at *5. Namely, to state an UTPA claim, the plaintiff must, among other elements, allege facts demonstrating willfulness – i.e., that "the defendant acted willfully at the

---

[2] Plaintiff's sole argument surrounding this element is that "the NVP involvement with the Vick litigation in similar circumstances to the Sand/UNUM deal should suffice to establish improper motive on the SMA Defendants' part." Pl.'s Am. Mot. Default 20 (doc. 82). Yet the facts alleged in the FAC do not necessarily reflect parity between plaintiff's transaction and the Vick transaction, insofar as the SMA Defendants never consummated the Sand/Unum deal and Vick was apparently the wrongdoer. *Goren I*, 2025 WL 3485722 at *3 n.4 (citing FAC ¶¶ 12-13 (doc. 48)). And, in any event, there are no allegations surrounding the status of that litigation at the time of the Goren Check or the NWB set off.

Page 11 – FINDINGS AND RECOMMENDATION

time of the misrepresentation, perhaps by alleging misconduct so inconsistent with the defendant's original promise that the court could reasonably infer the defendant did not intend to comply with her promises at the time they were made." *Colquitt v. Mfrs. & Traders Tr. Co.*, 144 F.Supp.3d 1219, 1231 (D. Or. 2015) (citation and internal quotations omitted; emphasis removed). As discussed herein, given that plaintiff's sole point of contact leading up to the investment was Goldman, coupled with the fact that the summary judgment record suggests the SMA Defendants did intend to consummate the Unum/Sand deal, this element does not appear to be met. *Cf. id.* at 1332 (no plausible allegation of willfulness existed where the defendant's alleged conduct was consistent with its promises). Therefore, neither plaintiff's motion nor complaint establish the elements of her negligence, negligent misrepresentation, fraudulent inducement, promissory fraud, breach of contract, breach of implied warranty, financial elder abuse, and UTPA claims sufficient to prove liability.

The fourth factor considers the sum of money at stake. As plaintiff concedes, the damages here are "substantial" – she seeks more than $1.3 million, along with attorney fees and costs. Pl.'s Am. Mot. Default 21 (doc. 82). As such, the fourth factor does not weigh in favor of granting plaintiff's amended motion. *See Westphal v. Ed's Mufflers Unlimited, Inc.*, 2018 WL 4390778, *3 (D. Or. June 11), *adopted by* 2018 WL 4390718 (D. Or. Sept. 14, 2018) ("a large sum of money at stake would disfavor default damages, such as a request for $114,200 in damages") (citations and internal quotations omitted).

The fifth factor surrounds the possibility of a dispute concerning material facts. The SMA Defendants were properly served but have not appeared in this case. And, as plaintiff accurately denotes, "[t]he core facts underlying [her] claims are not in dispute. The SMA Defendants received [her] investment, [Goldman] made representations regarding the use and return of those funds, and

[the SMA Defendants] failed to return the investment or provide any accounting." Pl.'s Am. Mot. Default 23 (doc. 82). Accordingly, the fifth factor supports the issuance of default judgment in relation to plaintiff's unjust enrichment claim. *Cf. Joe Hand Prods. v. Holmes*, 2015 WL 5144297, *7 (D. Or. Aug. 31, 2015) ("[t]he fifth factor . . . weighs in favor of default judgment when the claims in the complaint are well-pleaded").

Finally, the sixth and seventh factors favor granting plaintiff's amended motion in part. The sixth factor considers whether the defendants' default was due to excusable neglect, and in this case the record demonstrates that the SMA Defendants were served but have not appeared or otherwise indicated any intent to do so. As to the seventh factor, "default judgments are disfavored because cases should be decided on their merits whenever reasonably possible [but] the policy . . . favoring decisions on the merits does not weigh against default judgment because [the defendant's] failure to appear makes a decision on the merits impractical." *Contractors Bonding & Ins. Co.*, 2021 WL 5927682 at *3 (citations and internal quotations and brackets omitted). In sum, after balancing the *Eitel* factors, the Court concludes that default judgment should be entered as to plaintiff's unjust enrichment claim.

## II.     Damages and Attorney Fees

As plaintiff accurately notes, Oregon's financial elder abuse statute provides for treble damages under Or. Rev. Stat. § 124.100(2)(b). Pl.'s Am. Mot. Default 21, 26 (doc. 82). Likewise, plaintiff is correct that both the UTPA and financial elder abuse statute authorize attorney fees and costs for prevailing parties, as well as noneconomic damages. *Id.* at 15-16, 21, 26-27 (citing Or. Rev. Stat. § 124.100(2)(b) and Or. Rev. Stat. § 646.638(3)); FAC ¶¶ 63, 103 & pgs. 30-31 (doc. 48).

Yet, as addressed in Section I, neither plaintiff's motion, the FAC, nor the summary judgment record establish an entitlement to relief under those statutes. Plaintiff does, however, furnish sufficient information related to actual/economic damages in the amount of the Goren Check. Pl.'s Am. Mot. Default 25-26 (doc. 82); Goren Decl. ¶ 4 (doc. 82-1).

## RECOMMENDATION

For the foregoing reasons, plaintiff's Amended Motion for Default Judgment (doc. 82) should be granted in part. Specifically, the *Eitel* factors favor entry of a default judgment as to the $396,917.65 in economic damages sought in relation to plaintiff's unjust enrichment claim.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order. The parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the court. Thereafter, the parties shall have fourteen (14) days within which to file a response to the objections. Failure to timely file objections to any factual determination of the Magistrate Judge will be considered as a waiver of a party's right to de novo consideration of the factual issues and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to this recommendation.

DATED this 27th day of May, 2026.


_____/s/ Jolie A. Russo_____
Jolie A. Russo
United States Magistrate Judge