IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

|  |  |
|---|---|
| **BETSY GOREN**, on behalf of the Estate of Marjorie Goren,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>**SMA HUB, INC.**; **HUB BUSINESS TRUST**; **NV PARTNERS, LLC**; **JONATHAN WALKER**; and **NORTHWEST BANK**,<br><br>　　　　Defendants. | Case No. 3:24-cv-580-JR<br><br>**ORDER** |

**Michael H. Simon, District Judge.**

United States Magistrate Judge Jolie A Russo issued Findings and Recommendation ("F&R") in this case on May 27, 2026. Judge Russo recommended that this Court grant in part Plaintiff's Amended Motion for Default Judgment, which sought default judgment against Defendants Hub Business Trust, NV Partners, LLC, and SMA Hub, Inc. ("SMA Defendants").

Plaintiff's claims arise out of an investment she made on behalf of her mother, using her mother's retirement funds, in a "secondary market annuity" product offered by the SMA Defendants. The SMA Defendants are located in Oregon, and allegedly worked with Jill Goldman, a registered broker in Massachusetts, who was Plaintiff's primary contact. Plaintiff contends that the SMA Defendants fraudulently induced Plaintiff's investment of her mother's retirement funds through misrepresentations and material omissions. Plaintiff alleges claims for

PAGE 1 – ORDER

conversion, unjust enrichment, negligence, violations of Oregon's Unlawful Trade Practices Act ("UTPA"), breach of contract, breach of implied warranty, fraudulent inducement, "promissory fraud," negligent misrepresentation, and violations of Oregon's Abuse of Vulnerable Persons Act, Oregon Revised Statutes § 124.100 *et seq.*, alleging financial abuse of an elderly person ("financial elder abuse" claim). Plaintiff requests economic damages in the amount of her investment. Plaintiff also requests for her UTPA claim noneconomic damages in the amount of $50,000 plus attorney's fees, and for her financial elder abuse claim triple her economic and noneconomic damages plus attorney's fees.

Judge Russo recommends denying Plaintiff's motion with respect to all claims except her unjust enrichment claim, and enter default judgment in the amount of $396,917.65. Plaintiff did not file any objections.

Under the Federal Magistrates Act ("Act"), the court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1). If no party objects, the Act does not prescribe any standard of review. Although review is not required in the absence of objections, the Act "does not preclude further review by the district judge[] *sua sponte . . .* under a *de novo* or any other standard." *Thomas v. Arn*, 474 U.S. 140, 154 (1985).

After a *de novo* review of the F&R, the Court has some concerns. The claims for which the Court has concerns are discussed in turn.

## A.  Plaintiff's Negligence-Based Claims

The F&R foreclosed Plaintiff's negligence-based claims due to the lack of a special relationship. Courts, however, have recognized that financial advisors may have a fiduciary relationship with their clients. *See, e.g.*, *Primiani v. Fed. Ins. Co.*, 203 F. App'x 902, 904 (9th Cir. 2006) ("Appellants—as trusted financial advisers of myCFO's clients—owed a fiduciary

PAGE 2 – ORDER

duty towards the clients."); *Goldman, Sachs & Co. v. City of Reno*, 2016 WL 320120, at *4 (D. Nev. Jan. 25, 2016) ("The City has sufficiently alleged that GS acted as a financial advisor and breached its attendant fiduciary duties by failing to disclose facts material to the way the auctions were conducted, i.e., its supporting-bid practices."); *Freeney v. Bank of Am. Corp.*, 2015 WL 12535021, at *35 (C.D. Cal. Nov. 19, 2015) ("[A] broker or financial advisor is in a fiduciary relationship with his or her client.").

Indeed, in terms of the relationship between the SMA Defendants and Plaintiff, this case appears similar to *Negrete v. Fidelity & Guaranty Life Insurance Co.*, 444 F. Supp. 2d 998 (C.D. Cal. 2006). In *Negrete*, the plaintiff alleged that the defendant "used deceptive standard forms and other written materials to mislead prospective senior annuitants" and had its agents follow a "carefully scripted sales scheme" to "to lull senior citizens into believing that these inherently unsuitable annuities met their insurance and financial needs." *Id.* at 1000. The court concluded that a special relationship existed for purposes of the plaintiff's breach of fiduciary duty claim, based on the following allegations:

> By virtue of their purported positions as financial advisors, estate planning specialists, and because of their superior knowledge and ability to manipulate and control senior citizens' finances and legal status, the [managing general agents] and the [national marketing organizations], owned, operated and/or controlled by defendant who marketed and sold F & G annuities to senior citizens assumed fiduciary duties. . . .

*Id.* at 1004 (alterations in original) (quoting the underlying complaint).

It is unclear from Plaintiff's motion, however, if she is contending that Ms. Goldman was acting as an agent, whether with actual or apparent authority, of the SMA Defendants when she marketed and sold the annuity to Plaintiff describing the SMA Defendants' underlying specific upcoming deal and using the SMA Defendants' marketing materials. It is also unclear if Plaintiff is contending that the SMA Defendants directly were acting as financial advisors to Plaintiff or

PAGE 3 – ORDER

ratified Ms. Goldman's actions by entering into contracts based on the allegedly fraudulent materials. Because Plaintiff succeeding on her negligence-based claims would make no difference to the final judgment in this case, however, the Court declines to request additional clarification from Plaintiff and denies judgment for Plaintiff's negligence-based claims without adopting these portions of the F&R.

## B. Plaintiff's Fraud-Based Claims

The F&R concluded that Plaintiff did not plead with the requisite specificity Plaintiff's fraud claims and thus even accepting the allegations as true, they were insufficient to prove a fraud claim, and expressed concern that the misrepresentations came through a "third party." Plaintiff alleges that the SMA Defendants' written marketing materials contained misrepresentations and material omissions, and describes them in detail. These include the SMA Defendants' repeated statements regarding the safety of investing in their secondary marketing annuities and the care with which they handle such investments, at a time when they knew the significant risk with secondary marketing annuity investments and that they commingled funds. Plaintiff also alleges that she received the written materials before she made the investment and that she made the investment "based on" the alleged misrepresentations.

It is clear that the alleged false and misleading statements were made with the intent that investors would rely on them, and Plaintiff did rely on them. The fact that the SMA Defendants' marketing materials were provided to Plaintiff by Ms. Goldman does not detract from the SMA Defendants' fraud. *See, e.g.*, *Est. of Schwarz v. Philip Morris Inc.*, 206 Or. App. 20, 42 (2006*), aff'd sub nom. Est. of Schwarz ex rel. Schwarz v. Philip Morris Inc.*, 348 Or. 442 (2010), *adhered to on reconsideration*, 349 Or. 521 (2010) ("Defendant cannot shield itself from liability merely because it used a third party to deliver its misleading message."). This is particularly true in the context of sellers of these types of financial products, who would reasonably intend brokers to

PAGE 4 – ORDER

provide the information to investors. The Court thus concludes that Plaintiff has sufficiently proven her fraud claim, based on the Court accepting Plaintiff's allegations as true. *Cf. Warshaw v. Xoma Corp.*, 74 F.3d 955, 960 (9th Cir. 1996) (concluding, in the context of a motion to dismiss: "On the facts presented in the Complaint, it is not impossible to understand plaintiff's allegations. The Complaint alleges several optimistic public statements made by Xoma, its officers, the press, and securities analysts, between the dates of March 2, 1992 and June 4, 1992. The Complaint asserts that the defendants knew that the facts contravened their 'optimistic' statements that E5 was safe, effective, and would be approved by the FDA. In this case, we easily conclude that the Complaint satisfied Rule 9(b)").

## C.  Plaintiff's Claims for Financial Elder Abuse and UTPA

Regarding Plaintiff's financial elder abuse claim, the F&R rejected it because Plaintiff did not address whether the SMA Defendants were "banking institutions" and thus exempt under the statute. The F&R also concluded that Plaintiff failed to allege sufficient facts that the SMA Defendants acted with an improper motive or by improper means because the record showed that they intended to complete the underlying deal but ultimately was unable to do so.

The Court rejects the contention that SMA Hub, Inc. or NV Partners, LLC, fall within the definition of a "banking institution" based on the allegations that they are a corporation and a limited liability company, and the duties they are alleged to perform. It is possible, however, that Defendant Hub Business Trust falls within this definition, as a potential "Oregon Trust Company," and thus this claim cannot succeed against this Defendant.

For the remaining two Defendants, the Court also rejects that Plaintiff does not sufficiently allege facts showing an improper motive or improper means. Although the record may show that these Defendants had hopes of completing the underlying deal, the alleged improper means is the misrepresentations and half-truths provided to Plaintiff to induce her

PAGE 5 – ORDER

investment. These Defendants did not disclose the significant risk involved in secondary market annuities,[1] nor that despite their best intentions, they may not be able to complete the underlying deal and if they failed to do so, Plaintiff's investment would be lost. Nor did they disclose that they improperly commingled annuitant funds. The failure to disclose the full picture and allow an annuitant to make a fully informed investment decision shows the requisite improper means. *See, e.g.*, *Lake v. Valais Ventures, LLC*, 2025 WL 384297, *6 (D. Or. Feb. 4, 2025) (stating that "misrepresentation" and "deceit" constitute "improper means" (quoting *Gibson v. Bankofier*, 275 Or. App. 257, 269 (2015)).

**D.  UTPA**

The F&R rejected Plaintiff's UTPA claim for failure to show "willfulness" because the SMA Defendants had intended to consummate the underlying deal. But the Court has found that Plaintiff sufficiently has shown fraud. That finding is conclusive for Plaintiff's UTPA claim under Oregon Revised Statutes 646.608(1)(b), (e), and (g), because the SMA Defendants made false and misleading representations about the approval, characteristics, standards, benefits, and qualities of their secondary market annuities.

---

[1] The F&R rejected Plaintiff's argument that the alleged secondary annuity deal with Michael Vick supported this aspect of her claim. The F&R concluded that Plaintiff's allegations "do not necessarily reflect parity" between the transactions because the underlying deal in Plaintiff's promised annuity was never consummated, and because Plaintiff failed to allege the "status" of the Vick litigation at the time she wrote her check. The fact that the Vick deal was consummated and then defaulted, however, simply shows another aspect of the risk to this type of investing. And Plaintiff specifically alleges that Vick defaulted in January 2019 and that the SMA Defendants filed suit against Vick in July 2019, well before Plaintiff began considering her investment in 2020. These allegations are sufficient to show the SMA Defendants' knowledge of this type of risk in investing in secondary market annuities and yet they did not disclose the risky nature of the investment but instead emphasized how safe it was. The status of the litigation in 2020 would not detract from the knowledge already gleaned by the SMA Defendants. Even if Vick ultimately paid as a result of litigation, that would not reduce the risk posed by a default. Being forced to sue to recovery defaulted monies is risky and expensive.

PAGE 6 – ORDER

Indeed, claims under Oregon's UTPA are "much more easily shown" than common law fraud claims. *Wolverton v. Stanwood*, 278 Or. 709, 713 (1977). A plaintiff need not even show that "the alleged representation was made directly by the defendant to the plaintiffs or to a third-party with the intention that it be transmitted to plaintiffs." *Daniel N. Gordon, PC v. Rosenblum*, 276 Or. App. 797, 812 (2016), *aff'd sub nom. Gordon v. Rosenblum*, 361 Or. 352 (2017).

## CONCLUSION

The Court ADOPTS IN PART the Findings and Recommendation, ECF 83. The Court adopts the Background and the *Eitel* factors except the factor regarding the merits of Plaintiff's claims. For that factor, the Court adopts the discussion regarding Plaintiff's unjust enrichment, breach of contract, and breach of warranty claims, and declines to adopt the remaining discussion. The Court GRANTS IN PART and DENIES IN PART Plaintiff's Amended Motion for Default Judgment, ECF 82. The Court grants judgment in favor of Plaintiff for her claims for unjust enrichment, fraud, UTPA, and violations of Oregon's Abuse of Vulnerable Persons Act based on financial abuse of an elderly person (this latter claim only against SMA Hub, Inc. and NV Partners, LLC). Plaintiff is entitled to economic damages in the amount of $396,917.65 and noneconomic damages in the amount of $50,000. These damages are trebled against SMA Hub, Inc. and NV Partners, LLC, for $1,190,752.95 and $150,000.00, respectively, representing her total recovery. Plaintiff also is entitled to attorney's fees against the SMA Defendants. She may submit an attorney's fees application within two weeks of this Order.

**IT IS SO ORDERED.**

DATED this 3rd day of August, 2026.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge

PAGE 7 – ORDER